SHOPPIN' BAG OF PUEBLO, INC., a Colorado corporation and F.H. Markets, Inc., a Colorado corporation, Plaintiffs-Appellants,

v.

DILLON COMPANIES, INC., a Kansas corporation, Defendant-Appellee.

No. 84–1057.

United States Court of Appeals, Tenth Circuit.

Feb. 3, 1986.

James M. Lyons of Rothgerber, Appel & Powers, Denver, Colo. (Lynne Eisaguirre and Michael D. Burns, with him on brief), for plaintiffs-appellants.

Tucker Trautman of Ireland, Stapleton, Pryor & Pascoe, P.C., Denver, Colo. (Benjamin F. Stapleton and George G. Matava, with him on brief), for defendant-appellee.

Before BARRETT, McWILLIAMS and ANDERSON, Circuit Judges.

BARRETT, Circuit Judge.

Appellant Shoppin' Bag, a supermarket retail concern, opened a "no frills" grocery warehouse in Pueblo, Colorado, in March of 1979. Already established in the Pueblo marketing area were appellee (d/b/a King Soopers, a division of Kroger Companies, Inc.), Safeway, Albertsons and other independent grocers. During its first nine weeks of operation, Shoppin' Bag experienced a high degree of success.

In May, 1979, the president of King Soopers determined that in order to avoid substantial losses, its Pueblo stores had to dramatically reduce prices, even below total costs, to remain competitive with Shoppin' Bag. Prior to the entry of Shoppin' Bag into the Pueblo market, King Soopers held a 34%–38% share of the Pueblo market. Once King Soopers reduced its prices, the continued existence of Shoppin' Bag was seriously threatened.

In August, 1979, King Soopers was notified by the Federal Trade Commission that its pricing practices in the Pueblo area were to become the focus of an agency investigation. In September, 1979, King Soopers returned prices to levels consistent with its other stores throughout the state. The FTC investigation was then terminated.

Shoppin' Bag sued, alleging *inter-alia,* a violation of Section 2 of the Sherman Anti-Trust Act, attempting to monopolize the retail grocery market in the Pueblo area. (This is the only charge that went to trial; the parties stipulated to the dismissal [with prejudice] of all other charges). The jury trial spanned a period of twelve days.

The trial court granted King Soopers' motions in limine, excluding evidence relating to the FTC investigation and evidence relating to King Soopers' market share in the Front Range area (excluding Pueblo) and its profits in these other markets.

After several days of deliberating, and repeated questions to the trial court on the "dangerous probability of King Soopers'

achieving monopoly power," the jury found by special interrogatory that Shoppin' Bag had not sustained its burden of proof on the "dangerous probability" element. Thus, the jury found King Soopers not guilty of the antitrust violation. Judgment was entered against Shoppin' Bag. On appeal, it contends that certain jury instructions and evidentiary exclusions were erroneous, warranting a remand and new trial.

## DISCUSSION

I. Instruction on Elements of Attempted Monopolization

■ Shoppin' Bag alleged violation of 15 U.S.C. § 2—the attempted monopolization section of the Sherman Anti-Trust Act. In this circuit, four elements must be proven to establish a section 2 violation: (1) relevant market (including geographic market and relevant product market) in which the alleged attempt occurred; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt. *Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432, 436–37 (10th Cir.) *cert. denied,* 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983). Each element must be proven by a preponderance of the evidence and the jury was so instructed.

Of some concern to this court is the formulation of the second element: dangerous probability of success in monopolizing the relevant market. *See generally,* Annot., 27 A.L.R.Fed. 762 (1976). Traditionally, the "dangerous probability" element may be shown through the market power of the predator. In turn, market power may be shown through market share; i.e., percentage of the relevant market.[1] *See, e.g., United States v. Columbia Steel Co.,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948) (hereinafter *U.S. Steel*); *Olsen v. Progressive Music Supply, Inc., supra.* At the very least it must be shown how much of the relevant market a defendant

---

1. Here the relevant geographic market was Pueblo, Colorado, as stipulated by the parties.

The relevant product market was the subject of a special interrogatory.

controls if market power is to be evaluated. Of course, other conduct or circumstances may also be considered. *Olsen, supra,* at 437, (aggressive conduct of the plaintiff was considered in plaintiff's failure to establish that there was a dangerous probability that the defendant could monopolize the relevant market); and *U.S. Steel, supra,* (where the Supreme Court not only examined U.S. Steel's declining market percentage over a 45-year period but also noted the other companies and means of production that U.S. Steel had acquired during the period.) Many cases also look at market trends, number and strength of other competitors, and entry barriers.

■ It is generally agreed that while market share is indicative of market power, it is not the sole matter to be considered in assessing a defendant's market strength. Evaluating a firm's ability to achieve a monopoly by controlling prices and eliminating competition is a complex assessment based on as much information as is available to provide one with a broad understanding and appreciation of the market and competition in general. We believe that market power includes an examination of a defendant's market strength by analyzing many factors. Although largely dependent on the individual facts of any case, examples of factors to be considered can be found in the instructions given in this case as quoted below. The trial court here instructed the jury that:

> The second element you must consider in this case is whether there was a dangerous probability that King Soopers could succeed in monopolizing the relevant market. "Dangerous probability" means the probability of attaining the power to control prices in the market and the power to exclude competition from the market.
>
> The greater a firm's market power, the greater the possibility of successful monopolization.
>
> In order to be found liable for attempted monopolization, a firm must possess market strength—market strength that approaches monopoly power; that is, the

ability to control prices and exclude competition.

> Market strength is often indicated by market share. Market share alone, however, is not enough to determine a firm's capacity to achieve monopoly.
>
> Other factors you should consider include the number and strength of the defendant's competitors, the difficulty or ease of entry into the market by new competitors, consumer sensitivity to change in prices, innovations or developments in the market, whether the defendant is a multimarket firm, as well as other evidence presented to you that you may deem persuasive regarding defendant's market strength.

(Tr. 1936–37).

We hold that these instructions adequately informed and guided the jury on the type of information that could be considered, as well as the proper emphasis to be given to each piece of information.

On appeal, appellant urges this court to adopt the reasoning of the Ninth Circuit on the dangerous probability of success element, embodied in *William Inglis v. ITT Continental Baking Co.,* 668 F.2d 1014 (1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). *Inglis* involved several antitrust violations, including an attempt to monopolize under section 2 of the Sherman Act.

The *Inglis* court delineates its position on dangerous probability as inferable from proof of specific intent or conduct under certain conditions:

> [A] dangerous probability of success may be inferred either (1) from direct evidence of specific intent plus proof of conduct directed to accomplishing the unlawful design, or (2) from evidence of conduct alone, provided the conduct is also the sort from which specific intent can be inferred.

*Inglis* at 1029.

> [T]his sort of conduct must fall into one of two categories: either (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that

is clearly threatening to competition or clearly exclusionary. Proof of market power in the defendant may be relevant in establishing the requisite unreasonable conduct, but it is not essential. Such proof may also be relevant, as some cases seem to establish, because it may serve as sufficient direct proof of dangerous probability of success.

(citations omitted). *Inglis* at 1029 n. 11.

Shoppin' Bag urges this court to adopt the *Inglis* test. However, it is our view that the actual differences between the Ninth Circuit's position and the Tenth Circuit's position are not significant enough to conclude that one is preferable over the other for purposes of instructing the jury, because the actual result reached under either set of instructions will be similar.

Often no direct evidence of specific intent exists and inferences from conduct are necessary. Proving a dangerous probability of success by its very nature also demands proof of certain types of conduct (as discussed in Section I). In substance, the tests are very much alike.

We hold that the instructions given by the trial court accurately reflect the law as it currently exists in this circuit.

II. Instruction on the Definition of Monopoly Power

Shoppin' Bag further contends that the trial court erroneously instructed the jury with respect to the definition of monopoly power. "In order to be found liable for attempted monopolization, a firm must possess market strength—market strength that approaches monopoly power; that is, the ability to control prices and exclude competition." (Tr. 1937.)

Shoppin' Bag argues that the use of the word "and" in "control prices *and* exclude competition" instead of "or" erroneously enlarged its burden of proof. Shoppin' Bag and King Soopers' claim that *United States v. Grinnell*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), contains the Supreme Court's most recent version of a correct instruction. In *Grinnell*, the instruction appears as "the power to control

prices *or* exclude competition." *Id.* at 571, 86 S.Ct. at 1704 (emphasis added). Shoppin' Bag asserts that this recognizes that only one element but not both must be proven, although the elements are clearly intertwined. This language in *Grinnell* was taken from *United States v. E.I. du Pont de Nemours*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Shoppin' Bag faults the trial court for having given the instruction with the word "and" instead of the word "or." Formulating the instruction with "and" was in accord with *E.J. Delaney v. Bonne Bell, Inc.*, 525 F.2d 296, 305 (10th Cir.1975).

King Soopers asserts that the *Grinnell/du Pont* view is as follows: the concepts are the same and use of "or" in *du Pont* employs the word as a connector of synonymous phrases. King Soopers also points out that the *E.J. Delaney* case implicitly requires proof of both elements.

The confusion begins with the *du Pont* case itself. By using the language "... a power of controlling prices *or* unreasonably restricting competition," *du Pont, supra*, 351 U.S. at 389, 76 S.Ct. at 1003, it appears that proof of either element will establish market power. The opinion, however, explains that these two points are so closely related that they must be treated as one. *du Pont, supra* at 392, 76 S.Ct. at 1005. *Du Pont* makes it difficult to justify proof of one without proof of the other. Furthermore, the opinion holds that du Pont had power to control prices in cellophane but that the company lacked the power to exclude competition from the relevant market. Therefore, du Pont was not found to possess the requisite market power even though it possessed one of the elements. In our view, this seems to make it clear that both elements are required in order to establish market power. Only when one reads the Supreme Court's formulation of the appropriate test out of context is one uncertain of what is required. The import of *du Pont* is evident only upon a thorough review of the entire opinion.

Use of the *du Pont* language by lower courts does not clarify the correct test. Some choose to use "control prices *or* exclude competition," *Continental Cablevision v. American Electric Power Co.*, 715 F.2d 1115, 1120 (6th Cir.1983), while others state "control prices *and* exclude competition." *Borough of Lansdale v. Philadelphia Electric Co.*, 692 F.2d 307, 311 (3rd Cir.1982). Opinions from this court have used both versions of the *du Pont* language. *Compare, Board of Regents of University of Oklahoma v. National Collegiate Athletic Association*, 707 F.2d 1147, 1158 (10th Cir.1983) *aff'd* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (uses "or"); *and E.J. Delaney Corp. v. Bonne Bell, Inc.*, 525 F.2d 296, 305 (10th Cir.1975) (uses "and").

Some variation of the language appears in most post-*du Pont* cases without explanations of whether one or both elements are required to meet the stated test. The parties before us here, however, have appealed on this precise issue: which version of the *du Pont* test is, in fact, correct?

In light of the *du Pont* holding, we believe that both elements have been necessary since the test's initial inception. While the concepts of price and competition are closely connected, it is conceivable that if a company has obtained control over prices that it still may not have the power to exclude other competitors from the market. *See, e.g., du Pont.* At its core this ability to unlawfully manipulate power in the market place by whatever form is illegal. The differences between the elements will vary according to the factual scenarios which arise. Thus, easy distinctions between the concepts will not always be possible. It seems that in most instances a true evaluation of market power will not ultimately be possible without substantial data presented on both elements.

■ We hold, therefore, that monopoly power is correctly defined in this circuit as the ability to control prices *and* exclude competition.

## III. The Trial Court's Treatment of the Dangerous Probability of Success Element

■ Shoppin' Bag contends that the trial court converted the dangerous probability of success element of attempted monopoly into a threshold question rather than weighting it equally with the other required elements when it instructed the jury. The jury was instructed that four elements had to be proven to establish a section 2 violation of the Sherman Act. The definition of each element was included in the jury instructions and the jurors were told that each element had to be proven. Shoppin' Bag objects because the "dangerous probability" issue was listed before the specific intent and conduct issues. However, this ordering was random and no additional weight was placed on any of the elements. The special interrogatories also mirrored the equal weighting of each element. While other circuits have determined that the "dangerous probability" element should be given threshold status, *Broadway Delivery Corporation v. United Parcel Service of America, Inc.*, 651 F.2d 122 (2d Cir.1981), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1982), that is not the law in this circuit.

We conclude that the jury instructions taken as a whole adequately instructed the jury on the correct law to be applied.

## IV. Evidentiary Exclusions

Shoppin' Bag contends that certain evidence was erroneously excluded, that these exclusions were prejudicial, and that remand for a new trial is required. Shoppin' Bag challenges the exclusion of the following two evidentiary matters: (1) certain information relating to King Soopers' market power in the state of Colorado and (2) the initiation of an FTC investigation of King Soopers. Shoppin' Bag attempted to present evidence concerning the strength of King Soopers throughout the State of Colorado although both parties had stipulated that the relevant market was Pueblo. Without this "crucial" information Shoppin' Bag claims it could not establish that King Soopers possessed enough market strength to approach a dangerous probability of suc-

cess in achieving monopoly power. Shoppin' Bag sought to show that because of King Soopers' greater size and resources it could sustain losses at its Pueblo stores through subsidies from the remainder of its Colorado stores.

The trial court excluded evidence of the specific market shares in areas outside Pueblo and evidence of profits and losses from the other King Soopers' stores, on the ground that this evidence was irrelevant, given the stipulation that only Pueblo was the relevant market and because a thorough presentation of such evidence would be too time consuming. Much of the proposed evidence would have been disputed by King Soopers.

Admission of evidentiary matters under Fed.R.Evid. 403 is within the discretion of the trial court and will not be disturbed on appeal unless that discretion is abused. *Harris v. Illinois-California Express, Inc.*, 687 F.2d 1361, 1369 (10th Cir.1982). Here the trial court did allow evidence that King Soopers had fifty stores throughout the state and a filmstrip was shown on King Soopers' warehouse operations. All of the jurors had some familiarity with the King Soopers chain. Counsel for Shoppin' Bag was permitted to argue concerning the multi-market nature and strength of King Soopers based on this evidence. Thus, we cannot hold that Shoppin' Bag was unable to effectively present proof of the requisite elements in making its case.

Additionally, Shoppin' Bag contends that evidence concerning the initiation of an FTC investigation of King Soopers should have been admitted. Shoppin' Bag offered evidence of the FTC investigation for two purposes: (1) in its case-in-chief, to establish that King Soopers possessed an intent to monopolize the Pueblo market when it lowered prices, and (2) in rebuttal, to impeach the testimony of King Soopers' executives that it raised prices in September, 1979, only because King Soopers was sustaining losses in Pueblo. The trial court excluded the evidence in Shoppin' Bag's case-in-chief, ruling that it was not relevant, was too prejudicial, risked confusing and misleading the jury, and threatened the public policy of encouraging voluntary cooperation with FTC investigations. When Shoppin' Bag again requested permission to introduce this evidence in rebuttal for impeachment purposes, the court ruled that prejudice would far outweigh any relevancy the evidence might have.

In both instances, the trial court rejected the evidence on Fed.R.Evid. 403 grounds. Under Rule 403, the trial court has broad powers of discretion in assessing the probative versus the prejudicial value of evidence. *United States v. Franklin*, 704 F.2d 1183, 1187 (10th Cir.) *cert. denied*, 464 U.S. 845, 104 S.Ct. 146, 78 L.Ed.2d 137 (1983). In light of such broad discretion, we cannot overturn an evidentiary ruling unless that discretion has been clearly abused. *Harris, supra*, at 1369.

Here, because the FTC investigation was terminated shortly after it was begun and reached no conclusion about King Soopers' pricing behavior, the evidence was viewed by the trial court as having little probative value but as highly prejudicial. The trial court's ruling did not amount to a clear abuse of discretion.

The judgment of the trial court is AFFIRMED.