**WESTMAN COMMISSION COMPANY,**
Plaintiff-Appellee, Cross-Appellant,

v.

**HOBART INTERNATIONAL, INC.,**
Defendant-Appellant,
Cross-Appellee.

Nos. 83–1678, 83–1801.

United States Court of Appeals,
Tenth Circuit.

June 25, 1986.

---

George F. Karch, Jr., of Thompson, Hine & Flory, Cleveland, Ohio (Thomas J. Collin, of Thompson, Hine & Flory, Cleveland, Ohio, James E. Hautzinger and Robert E. Youle, of Sherman & Howard, Denver, Colo., with him on briefs), for defendant-appellant.

Kenneth L. Starr, of Holmes & Starr, Denver, Colo. (Sidney W. DeLong, of Holmes & Starr, Denver, Colo., and Michael J. Abramovitz, of Drexler, Wald & Abramovitz, Denver, Colo., with him on briefs), for plaintiff-appellee.

Before McKAY and SETH, Circuit Judges, and RUSSELL, District Judge.*

* Honorable David L. Russell, United States District Judge for the Western District of Oklahoma, sitting by designation.

McKAY, Circuit Judge.

This is an antitrust case based on the refusal of a manufacturer to grant a distributorship. The defendant, Hobart International Corporation, manufactures one of approximately fifty-three separate lines of kitchen equipment sold by both the plaintiff, Westman Commission Company, and Nobel, Inc., another kitchen equipment distributor in the Denver area. The trial court described Hobart's products as the "Cadillac" of the food service industry. *Westman Commission Co. v. Hobart Corp.*, 461 F.Supp. 627, 628 (D.Colo.1978) ("*Westman I*"). Its products are of such high quality and so reasonably priced that an expert in food facilities design testified at trial that "there is a noticeable absence of acceptable substitutes at a price comparable with that of Hobart products." *Id.*

In 1978, Hobart sold commercial kitchen equipment through its food service dealer division to approximately 540 independent distributors located throughout the country. Hobart distributors were a part of a group of approximately 1500 to 1600 restaurant equipment distributors in the United States. Hobart distributors were able to purchase Hobart products at factory prices and were eligible for factory rebates of up to eight percent of their Hobart business at the end of the year. In January 1976, Hobart had eight distributors in the highly competitive, Denver-area market. The most successful of those distributors was Nobel, which accounted for forty to fifty percent of the dollar volume of Hobart sales in the Denver-area market between 1973 and 1977. In addition to selling Hobart products, Nobel sold many other lines of kitchen equipment and all other commodities necessary to supply customers in the institutional food service or restaurant business.

From 1952 to 1973, Westman was in the wholesale grocery business—supplying frozen foods, dry groceries, paper products, and janitorial supplies to retail grocers, restaurants, hospitals, schools, and other buyers. In 1973 Westman entered the restaurant equipment supply business by purchasing the assets of the WE–4 Division of Wilscam Enterprises, Inc. At the time Westman purchased its WE–4 Division, Wilscam had an informal arrangement with Hobart to distribute Hobart products. For approximately fourteen months after Westman acquired the WE–4 Division, Hobart continued to make sales to Westman on a casual basis, but failed to offer Westman a formal distributorship agreement. Finally, in July 1974, Hobart informed Westman that it did not intend to offer Westman a distributorship. In January 1976, Hobart reaffirmed that it would not make Westman a Hobart distributor and informed Westman that it would no longer sell to Westman on a casual basis.

Thereafter, Westman brought this private antitrust action against Hobart alleging a violation of section one of the Sherman Act, 15 U.S.C. § 1 (1982). Westman claimed that Hobart had conspired with Nobel to prevent Westman from competing with Nobel in the Denver-area restaurant equipment supply market. There was no allegation that anyone other than Nobel and Hobart participated in the alleged conspiracy, that the alleged conspiracy had as its objective any tying arrangement, or that it was entered into to fix or stabilize prices. The sole factual basis for this action, as the trial court found on an adequate record, was that Nobel, fearing competition from Westman, urged Hobart to deny Westman a distributorship. The record shows that Nobel indicated to Hobart that, if Hobart granted Westman a distributorship, it would "jeopardize" Hobart's business relationship with Nobel. *Westman I*, 461 F.Supp. at 635. Although Hobart offered other reasons for its refusal to grant Westman a distributorship, the trial court dismissed those reasons as "pretextual." *Id.* at 636. Thus, it is clear from the record that Hobart, responding to Nobel's veiled threat, denied Westman a distributorship. The trial court determined that Hobart's refusal to deal constituted a per se violation of section one of the Sherman Act. It further concluded that, even under a rule-of-reason analysis, Hobart's

refusal to deal would not withstand antitrust scrutiny. *Id.*

## I.

As we approach this case, we must bear in mind that the purpose of the antitrust laws is the promotion of consumer welfare. Indeed, the Supreme Court has called the Sherman Act a "'consumer welfare prescription.'" *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 107, 104 S.Ct. 2948, 2964, 82 L.Ed.2d 70 (1984) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979). The Court has also explained that "an antitrust policy divorced from market considerations would lack any objective benchmarks." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 53 n. 21, 97 S.Ct. 2549, 2559 n. 21, 53 L.Ed.2d 568 (1977). We adhere to the view that the antitrust laws should not restrict the autonomy of independent businessmen when their activities have no adverse impact on the price, quality, and quantity of goods and services offered to the consumer. *See id.* Thus, we consider Hobart's refusal to deal in light of its effect on consumers, not on competitors. This approach is particularly important in cases involving vertical relationships, since such relationships often foster procompetitive business agreements. Accordingly, if the antitrust laws applicable to vertical dealings are uncertain or inefficient, they are likely to have a chilling effect on beneficial, procompetitive market interaction.

## II.

■ The trial court's decision in this case proceeds from its definition of the relevant market as "one-stop shopping." This term refers to a method of marketing in which a distributor carries multiple lines of the same product as well as lines of complementary products, so as to provide all the needs of a food service operation. The trial court explained:

> There is a recognized distinct market wherein a purveyor can supply a customer in the institutional food service or restaurant business with all requisite equipment and supplies. Commonly referred to as "one-stop shopping" or "full-line distribution," customers obtain convenience, cost savings and better service from a "one-stop shopping" distributor than from houses specializing in selected products.

*Westman I*, 461 F.Supp. at 628. Having defined the relevant market as "one-stop shopping," the trial court determined that Hobart's refusal to grant Westman a distributorship excluded Westman from the market and therefore constituted a per se violation of the Sherman Act. We recognize that market definition is a question of fact, *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 915 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975), and we thus review the district court's definition of relevant market under the "clearly erroneous" standard. *Monfort of Colorado, Inc. v. Cargill, Inc.*, 761 F.2d 570, 579 (10th Cir.1985).

The trial court concluded that Westman was excluded from the market even though it also found the market for Hobart products was highly competitive. *Westman I*, 461 F.Supp. at 634. Moreover, the trial court found that Westman continued to make equipment sales after Hobart refused to grant it a distributorship. *Westman Commission Co. v. Hobart Corp.*, 541 F.Supp. 307, 315 (D.Colo.1982) ("*Westman II*"). Indeed, Westman concedes in its brief that it "competes with Nobel in the sale of a broad spectrum of kitchen equipment and supplies," though it argues that this does not show effective competition in the "one-stop shopping" market. Appellee's Brief at 9.

■ In defining the relevant market as "one-stop shopping," the trial court apparently focused on the system of product distribution rather than the market facing the consumer of restaurant equipment. The trial court's focus justified the conclusion that "one-stop distribution" is an effective way to compete in the market. But the fact that "one-stop distribution" is an effective or even superior way to compete does not mean that the relevant market is

limited to those who use that method of competition. "Any definition of line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 592 (S.D.N.Y.1958); *see also El Cid, Ltd. v. New Jersey Zinc Co.*, 551 F.Supp. 626, 633 (S.D.N.Y.1982). The fact that a distributor is able to satisfy all of a customer's needs at one location does not mean that it is free from competition from other types of distributors.

■■■ Defining the relevant market first requires a determination of the product market. This inquiry necessitates an examination of which commodities are "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). It is clear from both the findings of the trial court and the concessions of Westman in its brief that there is vigorous competition for the restaurant equipment supply dollar in the Denver area. Although Hobart is considered the preeminent manufacturer of kitchen equipment, there is no evidence that the restaurant equipment produced by other manufacturers is not reasonably interchangeable with Hobart products. Admittedly, an expert witness testified at trial that "in certain lines of restaurant equipment there is a noticeable absence of acceptable substitutes at a price comparable with that of Hobart products." *Westman I*, 461 F.Supp. at 628. However, this witness did not testify that there was an absence of equivalent brands available in the market, only that there was an "absence of acceptable substitutes *at a price comparable* with that of Hobart products." *Id.* (emphasis added). Furthermore, we find nothing in the record to suggest that the cross-elasticity of demand between Hobart products and other competing products was inelastic. Indeed, because other manufacturers were competing with Hobart in the same market, the cross-elasticity of demand between Hobart products and other products was likely to be extremely elastic. In other words, raising the price of Hobart

products likely would lead many customers to purchase competing brands. Thus, the record does not support the conclusion that the product market is confined to "one-stop shopping" distributors offering a package of goods. Accordingly, as a matter of law, we hold that the relevant product market at a minimum consisted of the products generally sold by restaurant equipment dealers, whether or not those dealers carried a wide enough range of products and brands to be classed as "one-stop shopping" distributors. The trial court's finding that the product market consisted of less than this was clearly erroneous. *See Telex Corp. v. International Business Machines Corp.*, 510 F.2d at 919 (holding that, in light of evidence of cross-elasticity and interchangeable quality of products, the trial court's restricted definition of product market was plain error).

■■■ On appeal, Westman seeks to support the trial court's definition of the relevant market by citing authorities that suggest that sellers who provide a full line of products or services create a separate product market consisting of the "cluster or package" of goods or services. *See JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1016–17 (9th Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983); *United States v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 360, 90 S.Ct. 2035, 2041, 26 L.Ed.2d 658 (1970); *United States v. Philadelphia National Bank*, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963). In these cases, the "cluster or package" of goods or services was the object of consumer demand. In *JBL Enterprises*, the Ninth Circuit said: "This cluster approach is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately." 698 F.2d at 1016–17. Because the "cluster or package" of goods is not the object of consumer demand in the restaurant equipment supply industry, Westman's reliance on these cases is misplaced.

In *JBL Enterprises,* the court found that the "cluster approach" was appropriate because the hair-care and cosmetics industry "generally considers it necessary to carry a full line" and that "advertising and promotion often group the products." *Id.* at 1017. Here, in contrast, the record shows that competition in the restaurant-equipment supply industry generally does not occur at the full-line-of-services level. Until Westman entered the scene, Nobel was the only kitchen equipment distributor in the Denver area that used the "one-stop shopping" marketing strategy. *Westman I,* 461 F.Supp. at 629 n. 1. Also, nothing in the record suggests that an established "one-stop shopping" pattern exists in markets outside the Denver area. Thus, *JBL Enterprises* does not support the trial court's definition of the relevant market.

*Phillipsburg National Bank & Trust Co.* and *Philadelphia National Bank* are likewise inapposite. In those cases, the Supreme Court found the full-service, commercial banking industry to be a distinct market because it provided a package of products and services that "are so distinctive that they are entirely free of effective competition from products or services of other financial institutions." *Philadelphia National Bank,* 374 U.S. at 356, 83 S.Ct. at 1737; *see also Phillipsburg National Bank & Trust Co.,* 399 U.S. at 360, 90 S.Ct. at 2041. In the instant case, the trial court recognized that Nobel, the only "one-stop shopping" distributor in the Denver area, faces direct competition from "non-one-stop shopping" distributors. *See Westman II,* 541 F.Supp. at 315 (Westman continued to make equipment sales after being denied a Hobart distributorship); *Westman I,* 461 F.Supp. at 634 (indicating the restaurant equipment supply industry is highly competitive); *see also* Appellee's Brief at 9. Thus, for purposes of defining the relevant product market, the restaurant equipment supply industry is distinguishable from the commercial banking industry.

■ Defining the relevant market also requires a determination of the geographic market. The geographic market is " 'the narrowest market which is wide enough so that products from adjacent areas ... cannot compete on substantial parity with those included in the market.' " *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.,* 714 F.2d 351, 356 (4th Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984) (quoting L. Sullivan, *Handbook of the Law of Antitrust* § 12, at 41 (1977)). In other words,

the outer boundary of the relevant product market is reached, if one were to raise the price of the product or limit its volume of production, while demand held constant, and supply from other sources beyond the boundary could not be expected to enter promptly enough and in large enough quantities to restore the old price or volume.

*Id.* Thus, in defining the geographic market, the trier of fact should have considered all distributors who compete to supply equipment to Denver-area restaurants. The record indicates that distributors from Wyoming, Montana, New Mexico, and Utah competed with Westman and Nobel in the Denver area. Joint App. vol. I, at 172–74. Indeed, on some jobs, distributors as far away as California, Pennsylvania, and Texas vied to supply the equipment. *Id.* at 174. Thus, a trier of fact might have reasonably concluded that the relevant geographic market included restaurant equipment distributors from a multistate region that bid on Denver-area contracts. But for purposes of this appeal, it is sufficient for us to hold that, from this record, it was unreasonable as a matter of law for the court to conclude that the relevant geographic market included any less than the restaurant equipment suppliers located in the Denver metropolitan area.

### III.

■ After determining that Westman was excluded from the market, the trial court concluded that Hobart had committed a per se violation of the Sherman Act. We recognize that the applicability of the per se test in vertical restraint cases is in a state of evolution. After weighing the con-

flicting authorities, we choose to align ourselves with the Seventh Circuit. We agree that, "in the absence of any evidence of intent to raise prices ... an agreement whereby a supplier of some good or service refuses, at the behest of one of his distributors, to deal with a competitor of that distributor is not illegal per se." *Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Cos.*, 682 F.2d 660, 663 (7th Cir.1982); *see also Hennessy Industries, Inc. v. FMC Corp.*, 779 F.2d 402, 404 (7th Cir.1985). Recently, the Fifth Circuit joined the Seventh Circuit's view in an extensive and well-reasoned opinion. *Business Electronics Corp. v. Sharp Electronics Corp.*, 780 F.2d 1212 (5th Cir.1986). In that case, the court held that "in order for a manufacturer's termination of a distributor to be illegal *per se*, it must be pursuant to a price maintenance agreement with another distributor." *Id.* at 1218. The Ninth Circuit has expressed a similar view:

> Restraints solicited by a distributor but implemented by a manufacturer are not automatically per se violations. *A.H. Cox [& Co. v. Star Machinery Co.]*, 653 F.2d [1302,] 1306 [ (9th Cir.1981) ]. Restraints of this type come within the per se rule only if they "clearly had, or [were] likely to have, a pernicious effect on competition and lacked any redeeming virtue." *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors*, 637 F.2d 1376, 1386–87 (9th Cir.), *cert. denied*, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981).

*General Business Systems v. North American Philips Corp.*, 699 F.2d 965, 978 (9th Cir.1983). *See also Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133–34 (2d Cir. 1978) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979); *Ace Beer Distributors v. Kohn, Inc.*, 318 F.2d 283, 286–87 (6th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418, 420–21 (D.C. Cir.), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).

Other circuits have rejected this view, holding that a manufacturer who refuses to deal with a distributor commits a per se antitrust violation if the refusal is made at the behest of a competing distributor. These cases reflect the view that, even though the manufacturer's refusal to deal is a vertical restraint, it becomes "primarily horizontal in nature" because of the participation of the distributor who seeks "to suppress its competition by utilizing the power of a common supplier." *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 168 (3d Cir.1979). A review of the cases that have followed *Cernuto*, however, reveals that in most of those cases, price-fixing motives formed the basis for the manufacturer's refusal to deal. For example, even though the *Cernuto* court found the manufacturer's refusal to deal to be per se illegal, it stated that, upon remand, "if defendants can demonstrate that their actions were not motivated solely by considerations of price then the use of a *per se* rule might be inappropriate." *Cernuto*, 595 F.2d at 170, *see also Zidell Explorations, Inc. v. Conval International, Ltd.*, 719 F.2d 1465, 1470 (9th Cir.1983) (terminating a *price-cutting* distributor at the request of a competitor held to be a per se violation); *Victorian House, Inc. v. Fisher Camuto Corp.*, 769 F.2d 466, 469 (8th Cir.1985) (finding a per se violation by a manufacturer who terminated a *discounting* distributor); *JBL Enterprises*, 698 F.2d at 1015 (distinguishing *Cernuto* because it involved *pricing* motivations); *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 245 (6th Cir.1982) (distinguishing *Cernuto* because it involved the termination of a *price-cutting* distributor); *Products Liability Insurance Agency*, 682 F.2d at 663 (would follow *Cernuto* if case had involved price fixing. *But see Tunis Brothers Co., Inc. v. Ford Motor Co.*, 763 F.2d 1482, 1497–1501 (3d Cir.1985) (applying *Cernuto* rationale to manufacturer's refusal to deal in the absence of price-fixing allegations), *vacated and remanded*, —

U.S. ——, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986).[1]

The Supreme Court's recent decision in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775, *reh'g denied,* 466 U.S. 994, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984), confirms the correctness of our rejection of a per se analysis in this case. In *Monsanto,* the Court held that a plaintiff could not survive a directed verdict by merely establishing that a manufacturer terminated a price-cutting distributor in response to complaints of a competing distributor. *Id.* at 759, 104 S.Ct. at 1468. The Fifth Circuit explained in *Business Electronics Corp. v. Sharp Electronics Corp.*, 780 F.2d 1212 (5th Cir.1986):

> Nothing in *Monsanto* suggests that liability can be found without any evidence of a price fixing agreement. Rather the language of *Monsanto* can only indicate the Court's belief that *a price fixing agreement is a requirement for per se liability* in distributor-termination cases. For example, the Court indicated that a plaintiff must show that the "distributors are not making independent pricing decisions." *Monsanto, supra,* 465 U.S. at [762], 104 S.Ct. at 1470. The Court also

stated that "it is of considerable importance that independent action by the manufacturer, and concerted action on nonprice restrictions, be distinguished from price-fixing agreements, since under present law the latter are subject to per se treatment and treble damages." *Id.* Finally, the Court defined the concept of "common scheme" as including communication between the parties as to an agreement on price. *Id.* at 764 n. 9, 104 S.Ct. at 1471 n. 9.

*Business Electronics Corp.*, 780 F.2d at 1218 (emphasis added).[2]

Since the record reveals not the slightest hint of price maintenance or price fixing, Hobart's refusal to deal cannot be illegal per se. Of course, if there were allegations of retail price maintenance, price fixing, or tying arrangements, our analysis would be quite different. *See Monsanto,* 465 U.S. at 761 & n. 7, 104 S.Ct. at 1469 & n. 7 (retail price maintenance); *World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1476–77 (10th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 77, 88 L. Ed.2d 63 (1985) (retail price maintenance); *Motive Parts Warehouse v. Facet Enterprises,* 774 F.2d 380, 387–88 (10th Cir.1985)

---

**1.** The Third Circuit has also applied the *Cernuto* analysis in the absence of price-fixing allegations in *Malley-Duff & Assoc. v. Crown Life Ins. Co.,* 734 F.2d 133, 139–42 (3d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984). *Malley-Duff* is distinguishable from the instant case, however, because it involved a group boycott. *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), is distinguishable for the same reason. For a group boycott to exist, there must be an agreement among conspirators whose market positions are horizontal to each other. There is no evidence in the record of any horizontal combination; Hobart was the only manufacturer that refused to deal with Westman. *See Terry's Floor Fashions v. Burlington Industries,* 763 F.2d 604, 610 n. 10 (4th Cir.1985). We reject the view of the Sixth Circuit that an agreement between a single manufacturer and a single distributor can constitute a per se illegal group boycott. *See Com-Tel, Inc. v. Dukane Corp.,* 669 F.2d 404 (6th Cir.1982).

In addition, we are aware of the Supreme Court's decision in *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d

515 (1972), but find that case distinguishable. In *Topco,* the Court held that a cooperative association for supermarkets violated the Sherman Act when it gave association members a "veto of sorts" over the admission of new members. *Id.* at 602, 92 S.Ct. at 1130. In the instant case, Nobel had no such "veto power" over Hobart's distributorship decisions. Hobart's refusal to deal with Westman was a vertical restraint, as opposed to a "horizontal restriction among ostensible competitors," as was the case in *Topco. Continental T.V.,* 433 U.S. at 57 n. 27, 97 S.Ct. at 2561 n. 27.

**2.** In a case containing no allegations of price fixing, *Blankenship v. Herzfeld,* 661 F.2d 840, 844–45 (10th Cir.1981), we quoted from *Cernuto,* but found that it did not mandate finding an antitrust violation because the defendant-manufacturer had acted independently when it terminated its distributor. We emphasize that, in light of the view expressed in *Monsanto, Blankenship* should not be read to imply that we would apply the *Cernuto* per-se-illegality standard absent allegations of price fixing or maintenance.

(price fixing); *Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 438 (10th Cir.), *cert. denied*, 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983) (price fixing); *Black Gold, Ltd. v. Rockwool Industries, Inc.*, 729 F.2d 676, 685–86, *aff'd on rehearing*, 732 F.2d 779, (10th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984) (tying arrangements).

## IV.

■ In rejecting a per se analysis, we believe that a manufacturer generally should have wide latitude in determining the profile of its distributorships. Accordingly, we adhere to the view expressed by the Supreme Court in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) (overruled on other grounds by *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). In commenting on vertical restraints, the Court stated:

> [A] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods.

*Id.* at 376, 87 S.Ct. at 1864.

The trial court stated that the above-quoted passage in *Schwinn* was inapplicable to this case for two reasons: first, because this case does not involve an exclusive distributorship or franchise; and second, because the evidence showed that "much of Hobart's product line does not have equivalent brands available in the market." *Westman I*, 461 F.Supp. at 637.

■ Although the trial court correctly observed that *Schwinn* involved an exclusive franchise, we believe that a manufacturer's ability to choose its customers should not depend on whether it has contracted to limit distribution under an exclusive franchise agreement. A manufacturer should be free to restrict distribution

whether or not its decision is made pursuant to an exclusive franchise agreement. Whether or not a franchise agreement exists, the manufacturer will likely be motivated in part by its desire to ensure the loyalty of its distributors. And, ultimately, the manufacturer's decision whether to limit its distributorships will be based on whether the manufacturer believes that limited distribution will make its products more competitive in the market.

■ Although the evidence showed there was an absence of acceptable substitutes for Hobart products at a comparable price, this fact does not make the broad principle stated in *Schwinn* inapplicable to this case. In effect, the trial court's approach subjected Hobart to especially strict antitrust treatment simply because it produced high quality products and sold them at a price lower than that demanded for competing products of equal quality. Such an approach flies in the face of antitrust policy, because it punishes the manufacturer for making a procompetitive decision to keep its prices low. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 1359, 89 L.Ed.2d 538 (1986). In our view, the fact that a manufacturer sells a high quality product at a price lower than that offered by its competitors does not, by itself, provide a basis for strictly scrutinizing the manufacturer's distributorship arrangements.

■ A manufacturer's ability to limit its distributorships may not be restricted because of the absence of equivalent brands unless the manufacturer possesses "market power" with respect to the product whose distributorship arrangements are being questioned. "Market power is the ability to raise prices above those that would be charged in a competitive market." *Board of Regents of University of Oklahoma*, 468 U.S. at 109 n. 38, 104 S.Ct. at 2965 n. 38.[3]

---

3. We distinguish this definition of "market power" from the definition of "monopoly power" we recently offered in *Shoppin' Bag of Pueblo, Inc.*

*v. Dillon Cos.*, 783 F.2d 159, 163–64 (10th Cir.1986). In *Shoppin' Bag*, we held that "monopoly power" in a Sherman Act, section two,

Ascertaining whether a manufacturer has market power requires the court to employ a market analysis. This court has explained:

> Whether market power exists or can be exercised in the relevant geographic market depends upon the existence of competing products to which a purchaser can turn when faced with relative price increases. Whether product competition exists is determined by two factors:
>
> > "(a) The reasonable interchangeability of use to which two or more products can be put. This factor, in turn, is satisfied when two or more products (i) have essentially similar physical characteristics, or (ii) can be put to use for the same purpose.
> >
> > (b) The cross-elasticity of demand, i.e., the extent to which consumer preference shifts freely between two or more products."

*Board of Regents of University of Oklahoma v. NCAA*, 707 F.2d 1147, 1158 (10th Cir.1983) (quoting 2 J. Von Kalinowski, *Antitrust Laws and Trade Regulations* § 6G.04[1] (1982)), *aff'd*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

▬▬ The trial court did not employ a market power analysis. It merely found that the kitchen equipment supply market is highly competitive, that Hobart goods are of high quality, and that equivalent brands are not readily available at a comparable price. *See Westman I*, 461 F.Supp.

at 628, 637. Thus, we conclude that the statement in *Schwinn* regarding a manufacturer's ability to determine its distributorship arrangements applies directly to the case at hand.[4]

### V.

Sound economic theory supports the cases that have allowed suppliers wide latitude in selecting their distributors. The Supreme Court has recognized that "manufacturers have an economic interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of their products." *Continental T.V.*, 433 U.S. at 56, 97 S.Ct. at 2560 (citations omitted). The only real incentive a manufacturer has to restrict distribution of its product is to make its product more competitive. It gains nothing by reducing competition in the distribution of its product. In fact, it has a stake in encouraging distributors to compete by providing more services in conjunction with the sale of its products. *See* Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 U. Chi. L. Rev. 6, 23 (1981). As one commentator explains:

> [C]ompetition is a continuing search for survival by firms seeking to find more efficient ways to meet shifting and variegated consumer needs; thus, all vertical arrangements between a single manufac-

---

case is "the ability to control prices *and* exclude competition." *Id.* at 164; 15 U.S.C. § 2 (1982). In our view, proof of "market power" required for a court to restrict a manufacturer's ability to freely distribute its goods requires a lesser showing. To demonstrate "market power," a plaintiff may show evidence of *either* "power to control prices" *or* "the power to exclude competition." *See Board of Regents of Univ. of Okla. v. NCAA*, 707 F.2d 1147, 1158 (10th Cir.1983), *aff'd*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). We believe that this lesser showing should be required because a manufacturer may possess the ability to sustain a supracompetitive price for its products, even though the manufacturer itself does not have direct power to exclude competition. Competitors may be stopped from entering that manufacturer's market by entry barriers that are wholly independent of a single manufacturer's ability to exclude. Such entry barriers may include

high capital costs or legal barriers, such as patents or copyrights. In the presence of these types of entry barriers, a court may find the existence of "market power," even though it does not find that the manufacturer has the "power to exclude competitors."

4. *Another reason that the broad language in Schwinn arguably should not apply to the instant case is that Schwinn involved a manufacturer who acted unilaterally, without pressure from a distributor. Hobart, on the other hand, denied Westman a distributorship after receiving complaints from Nobel. However, we believe a manufacturer should be able to weigh the threat of losing dealer loyalty when making distributorship decisions and therefore do not consider this distinction to be critical. See infra part VII.*

turer and those reselling his products are seen as ways of competing that would not exist if the manufacturer did not believe they would increase his profit by increasing his efficiency, as well as the profit and efficiency of his distributors and/or dealers—and, therefore, in the end, achieve proconsumer goals.

Bock, *An Economist Appraises Vertical Restraints*, 30 Antitrust Bull. 117, 120–21 (1985); *see also* Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135, 140–53 (1984) (explaining that "restricted dealing is a way to compete"). Thus, a manufacturer faces strong market forces impelling it to set up an efficient system of distribution. In some cases, those forces may lead the manufacturer to refuse to deal with certain potential distributors. But, even though those refusals to deal may limit intrabrand competition, they are likely to benefit consumers by increasing interbrand rivalry. *See Continental T.V.*, 433 U.S. at 54–55, 97 S.Ct. at 2559–60.

There are several reasons why it is procompetitive to permit a manufacturer to limit the number of outlets that distribute its products. A few are readily apparent. First, when a manufacturer limits the number of its distributors, it may reduce its distribution costs by allowing each distributor to achieve economies of scale and to spread out fixed costs over a large amount of products. *See id.* at 55, 97 S.Ct. at 2560. Second, refusals to deal may facilitate the entry of new manufacturers into the market. The prospect of limited intrabrand competition that results from restricted distribution may encourage distributors to make the investment necessary to carry a new manufacturer's product. *See id.* Third, limiting the number of outlets that distribute a product may encourage distributors to provide promotional activities, consumer information, and product service. These activities may in turn lead to increased interbrand competition. When a manufacturer limits the number of retail outlets for its products, it ensures that competing sellers of its product will not get

a "free ride," or benefit from the promotions or service provided by other distributors. *See id.*; Bork, *Vertical Restraints: Schwinn Overruled*, 1977 Sup. Ct. Rev. 171, 180–81 (discussing ways that vertical restraints can enhance efficiency). Finally, restricting distribution can reduce transactions costs by permitting a manufacturer to deal only with distributors with whom it believes it can develop an efficient working relationship.

Moreover, in the complicated area of vertical restraints, inexactness in the law can hinder decisions and practices that ultimately enhance market efficiency. As Assistant Attorney General McGrath, head of the Justice Department's Antitrust Division, has observed, "businesses may be deterred from using procompetitive vertical practices by the prospect of long and costly litigation and uncertain results, to the detriment of the economy." Department of Justice Guidelines—Vertical Distribution Restraints, 5 Trade Reg. Rep. (CCH) ¶ 50,473 at 56,186 (May 15, 1985). If the antitrust laws are applied so as to interfere with a manufacturer's ability to deal freely with its distributors, procompetitive vertical restraints may be deterred. In the end, we are convinced that, when a manufacturer is left free to determine the profile of its distributorships, procompetitive incentives will lead it to make distribution decisions that ultimately benefit consumers.

## VI.

The trial court's failure to account for the impact of Hobart's actions on consumer welfare is readily apparent in the court's application of the rule of reason to Hobart's refusal to deal. The trial court's rule-of-reason analysis began with an accurate statement of the relevant inquiry: "The rule of reason requires a complex determination of the *effect of a given business arrangement or agreement on competition* and the possible justifications of any adverse effects." *Westman I*, 461 F.Supp. at 636 (emphasis added). This explanation squares with the still-author-

itative discussion of the rule by Justice Brandeis:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.

*Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

 Though the trial court correctly explained the rule-of-reason analysis, it failed to apply the analysis properly. The court merely discussed Hobart's stated reasons for refusing Westman a distributorship and dismissed them as "pretextual." *Westman I,* 461 F.Supp. at 636. After concluding that Westman was a qualified distributor and that it had been denied a distributorship as a result of a conspiracy, the court returned to the market exclusion analysis it had relied on to find a per se violation. Without discussing the effect of Hobart's refusal to deal on consumers in the restaurant equipment supply market, the trial court concluded its rule-of-reason discussion with the bald assertion that trade had been restrained: "If a trader does not have access to Hobart equipment at the same or approximate price as its competitors then the trader is excluded from the market, trade is restrained and the benefits of competition are impoverished." *Id.* at 637–38.

 We find no discussion in the court's opinion of the effects that Hobart's refusal to deal had on competition in the restaurant equipment supply market. *See Chicago Board of Trade,* 246 U.S. at 238, 38 S.Ct. at 243. Specifically, the court failed to consider the possibility that Hobart's refusal to deal may have promoted interbrand competition. Even though vertical restraints may diminish intrabrand competition, they may "promote interbrand

competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." *Continental T.V.,* 433 U.S. at 54, 97 S.Ct. at 2560. A thorough rule-of-reason analysis would likely have led the trial court to conclude that Hobart's refusal to deal did not reduce interbrand competition in the Denver-area restaurant equipment supply market. Given the competitiveness of this market, it is highly unlikely that a manufacturer's refusal to deal would have any meaningful effect on interbrand competition. *See Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 298 (5th Cir.1981) (where interbrand competition is vigorous, termination of distributor is insufficient to support a Sherman Act violation).

Though Westman may have been able to compete more effectively had it been granted a Hobart distributorship, the record does not support the conclusion that Hobart *products* competed less effectively as a result of Hobart's refusal to grant Westman a distributorship. To the contrary, Hobart's refusal to add another distributorship may have had the salutary effect of increasing distributor loyalty or inducing Hobart distributors to provide more pre- and post-sale services, thus causing Hobart products to compete more effectively in the market. Interbrand competition generated by Hobart's refusal to deal may have in turn increased consumer welfare by increasing interproduct rivalry between restaurant equipment manufacturers.

The trial court's erroneous rule-of-reason analysis, standing alone, would require us to remand for a reevaluation of the impact of Hobart's refusal to deal on interbrand competition. *See Borger v. Yamaha International Corp.,* 625 F.2d 390, 397 (2d Cir. 1980) (reversible error not to instruct jury to consider the effects of vertical restraint on interbrand competition). But, because we believe that Hobart's refusal to grant Westman a distributorship did not violate section one of the Sherman Act, we find it unnecessary to remand to the district court.

## VII.

We have recognized above that a manufacturer may properly decide to limit the number of its distributorships for several reasons, one of which may be to ensure dealer loyalty. Whether a manufacturer's decision to limit its distributorships is made when the manufacturer first enters the market through such devices as exclusive or limited distributorships, or whether its decision is made later by denying additional distributorships pursuant to the request of an existing distributor, the effect is the same—the exclusion of a potential distributor-competitor from the market in that manufacturer's product. Responding to the possibility of the loss of an existing distributor's loyalty is analytically no different from ensuring distributor loyalty in advance by the granting of an exclusive distributorship.

 Because we believe that manufacturers should be free to choose and terminate their distributors free of antitrust scrutiny so long as their motivation does not involve illegal pricing or tying arrangements, we hold that section one of the Sherman Act does not proscribe refusals to deal absent a showing of monopoly or market power on the part of the manufacturer. *See Schwinn*, 388 U.S. at 376, 87 S.Ct. at 1864. The evil to be avoided is the reduction of *interbrand* competition between the manufacturer's distributors, not the reduction of *intrabrand* competition. The trial court's findings in this case compel the conclusion that, on an interbrand basis, the restaurant equipment supply market in the Denver area is highly competitive. Moreover, nothing in the record demonstrates that Hobart had market power. Thus, Hobart's refusal to grant Westman a distributorship at the insistence of Nobel did not violate section one of the Sherman Act. If Westman has any remedy against Hobart or Nobel, it must resort to state law.

For the foregoing reasons, judgment shall be entered in favor of Hobart, and the trial court's award of attorney's fees is reversed.

SETH, Circuit Judge, specially concurring:

I concur specially in the majority opinion in this appeal and arrive at the same result but by a slightly different route.

In my view there is no substantial problem as to the product market. The case was tried on the assumption that the product market was restaurant equipment and restaurant supplies. The testimony was so directed. The trial court so found by its adoption of the one-stop shopping distribution method wherein all needed equipment and supplies were provided.

My definition of a geographic market may be somewhat different from that expressed by the majority in Part II of the opinion. I would disregard the location of the suppliers and instead examine the proof to determine the trade area—that is, where the products are made available to the buyers with the prices at balance, thus the area where a price increase or supply reduction would cause a prompt influx of the products of others not already in the area.

As to the proof, in my view, the trial itself proceeded on the assumption that "the Denver area" was the geographic market area. Again, the proof was so directed. However, the trial court took the proof one step beyond this "Denver area" geographic market and moved into another and quite different subject. Thus, as the majority points out, the trial court's "one-stop shopping" was not a market conclusion. It was instead a description of a marketing method in the Denver area and that alone. I would thus stop with the "Denver area" as the geographic market. This does not necessarily do violence to the trial court's conclusion as it backs it off to the last real geographic market proof before the extra step was taken—the step beyond. In addition, there was shown to be only one distributor using the one-stop method in the Denver area.

I would thus agree with the majority, but on these somewhat different grounds that the Denver area was the geographic mar-

ket and restaurant equipment and supplies constituted the products market.

I agree with the majority that the position taken by the plaintiff and the uncontroverted proof demonstrate that there was no market power exercised by the defendant, and to the extent the trial court found that there was, it was clearly erroneous.

I also agree with the majority that there can be no per se violation in these circumstances, that is, in the absence of allegations of illegal pricing (maintenance or increases) or tying arrangements.

I am uncertain as to what really remains of the decision in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, and for that reason I am not prepared to rely on segments of it.

Sections V and VI of the majority opinion are concerned with economic theory and I am unable to concur in them. Section V begins with an express reliance on what it terms "sound economic theory." I am not sure there is any such thing as a characterization of the new and retreaded economic theories depends so much on where you sit.

For the above reasons I would reverse.