828 F.2d 635
 1987-2 Trade Cases 67,685
 KEY FINANCIAL PLANNING CORPORATION, a Colorado corporation,
Reuben S. Sorensen and Anne-Marie Sorensen,
Plaintiffs-Appellants,
v.
ITT LIFE INSURANCE CORPORATION, a Wisconsin corporation,
Diversified Financial Planners, Inc., a Colorado
corporation, Fred K. Nelken, David
Fabian and Sandra L. Weidaman,
Defendants-Appellees.
 No. 84-2800.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 28, 1987.
 
 Phillip S. Figa (Hugh A. Burns with him, on briefs), Burns & Figa, P.C., Denver, Colo., for plaintiffs-appellants.
 Teryl R. Gorrell of Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Colo., and Richard E. Falcone, Colorado Springs, Colo., for defendants-appellees.
 Before ANDERSON, BARRETT, and TACHA, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 This is an antitrust case in which the plaintiff/appellant Key Financial Planning Corporation ("Key")[1] alleges that the defendant insurance corporation and its subsidiary agents violated the Sherman Antitrust Act, 15 U.S.C. Secs. 1, 2. Essentially, the heart of the complaint is that the defendants, in violation of section one, conspired to restrain trade by depriving Key of its share of the ITT life insurance business in Aurora, Colorado. Key also alleges that the defendants, in violation of section two, attempted to monopolize the ITT life insurance market in Colorado. The district court granted summary judgment to the defendants on the federal antitrust claims and dismissed pendent state claims. Key appeals, arguing that its evidence was sufficient to survive the defendants' motion for summary judgment. After examining Key's arguments, we reject them and affirm the summary judgment.
 
 BACKGROUND
 
 2
 The business relationships among Key and the defendants are multi-layered. Defendant/appellee ITT Life Insurance Corporation ("ITT") sells life insurance through contracted agents. As is common in the insurance industry, these agents are part of an organized sales hierarchy consisting of Field Marketing Directors ("FMDs") at the top, then general agents, and then field agents. FMDs sell insurance and also recruit, recommend, and oversee the tier of general agents. In return the FMDs receive an override commission on business written by the general agents. The general agents, in turn, have authority to recruit and recommend field agents and receive an override commission on business written by the field agents. When an insurance policy is issued by ITT, it advances for distribution among the agents 100% of the commission for the policy. The advance commissions are treated as loans and must be repaid to ITT if they are not ultimately earned, i.e. if a policy is prematurely cancelled. FMDs are liable for repayment of all advances that general agents and agents under them fail to repay. Similarly, general agents are liable for advances made to agents under them.
 
 
 3
 Defendants/appellees Diversified Financial Planners, Inc. ("Diversified"), located in Colorado Springs, Colorado, and Fred Nelken, its Vice-President, operated as an FMD for ITT with apparent authority, along with other FMDs, to recruit general agents throughout Colorado and a few adjacent states. In November 1980, Nelken contacted Key, a new company organized in September of 1980 and located in the Denver area at Aurora. Key already had agency contracts with several other insurance companies, and on November 11, Key became an ITT general agent as well.
 
 
 4
 Evidence shows that from its inception Key experienced financial difficulties, resulting, in part, from the loss of promised financing. Whether or not as a result of financial difficulties, the phones that were used to contact potential insurance customers were shut off for the last two weeks of December 1980. In early January, Key's President, Reuben Sorensen, entered into an agreement with Global Marketing, an enterprise that sold photograph packages door-to-door. Under the agreement Sorensen received an override on sales made by Global. Global allegedly disrupted the Key Office with its attempts to persuade Key agents to stop selling ITT insurance and sell photograph packages instead. Diversified's Nelken learned of Key's relationship with Global in mid-January when he noticed a newspaper ad listing Key's telephone number and soliciting applications for employment to sell photos. After conversations with Sorensen and several employees of Key, including defendants Fabian and Weidaman, regarding the Global relationship, Nelken informed Sorensen in January 1981 that he was recommending Key's termination as an ITT general agent. ITT subsequently terminated Key, giving 30-days' notice as required by the agency contract.
 
 
 5
 Defendants maintain that Nelken's recommendation of Key's termination as an ITT general agent was made "because of lack of production, because the general agent was attempting to get agents to sell products other than insurance, and because Key was not the quality of agent Diversified was looking for." Brief of ITT at 10. As of January 15, 1981, Key agents had taken four applications for ITT insurance policies. One of these was later cancelled and another was sold to a secretarial employee, Sandra Weidaman.[2] The week following the termination recommendation, seven additional applications were taken. One of these was cancelled. Nine policies were ultimately issued by ITT from Key applications; five were subsequently cancelled, leaving four in force.
 
 
 6
 At some point, Nelken and Key agents, including co-defendant Fabian, discussed the possibility of employment transfers to Diversified. In order for the transfers to take place, Key's Sorensen executed releases, and in February 1981, Diversified opened an Aurora office. The agents who transferred from Key began selling ITT insurance for Diversified out of this office. Co-defendant Weidaman also transferred to the Diversified office. Diversified's Aurora office was closed three months later in May, 1981, apparently due to a lack of production.
 
 
 7
 The defendants maintain that transfer discussions between Nelken and Key employees occurred only after the agents learned that Key's agency contract with ITT was to be terminated. They also insist that the discussions were initiated by the Key agents. The plaintiffs, however, characterize the chain of events--conversations with Key employees, the contract termination, and subsequent transfer of Key personnel--as evidence of a conspiracy to drive Key out of business and capitalize on Key's development of the Aurora market.
 
 I.
 
 8
 In reviewing a summary judgment, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538 (1986) (ellipses original) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). Nonetheless, mere conclusory allegations do not establish an issue of fact under Fed.R.Civ.P. 56. Bright v. Moss Ambulance Serv., Inc., 824 F.2d 819, 824 n. 6 (10th Cir.1987); Instructional Sys. Dev. Corp. v. Aetna Casualty & Sur. Co., 817 F.2d 639, 644 (10th Cir.1987). Rather, "allegations of restraint of trade must be supported by significant probative evidence in order to overcome a motion for summary judgment." Instructional Sys. Dev. Corp., 817 F.2d at 644 (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289-90, 88 S.Ct. 1575, 1592-93, 20 L.Ed.2d 569 (1968)). In an antitrust action based on section one of the Sherman Act, as here, ambiguous evidence, standing alone, is not enough to survive a defendant's motion for summary judgment. "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a Sec. 1 case.... To survive a motion for summary judgment ... [a plaintiff] must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." Matsushita, 106 S.Ct. at 1357 (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)).
 
 
 9
 This circuit recently restated the Matsushita standard as a two-part evidentiary test:
 
 
 10
 (1) is the plaintiff's evidence of conspiracy ambiguous, i.e., is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.
 
 
 11
 Gibson v. Greater Park City Co., 818 F.2d 722, 724 (10th Cir.1987). In other words, if the evidence is as consistent with permissible independent business interests as with an illegal conspiracy, then the plaintiff fails to create a fact issue on the existence of a section one conspiracy unless the ambiguity is negated by evidence tending to exclude the possibility that the defendants were pursuing independent interests. We turn first to the question of ambiguity, then to whether any evidence tends to negate the possibility of legitimate business interests.
 
 
 12
 A. Is The Evidence of Conspiracy Ambiguous?
 
 
 13
 Key alleges that "[d]efendant Nelken combined and conspired with Defendants ITT, Diversified, Fabian and Weidaman to terminate the agency contract between Plaintiff Key and Defendant ITT." Complaint, R.Vol. I at 3, p 11. In particular, it claims that Nelken conspired to take ITT business away from Key and open a Diversified office in the Denver area while avoiding the substantial costs and effort normally involved in establishing a new office. It maintains that the following facts and events support that claim: (1) Nelken was an authorized agent of ITT with independent authority to appoint and terminate general agents subject to automatic and perfunctory approval of ITT, (2) Nelken had plans to locate new offices in seventeen metropolitan areas including Denver, and ITT was aware of these plans more than a month before Key's termination; (3) soon after Key's termination, Diversified established a new agency in the Denver suburb of Aurora selling ITT insurance; (4) there was incentive for Key agents to transfer to Diversified because Diversified agents could earn higher commissions than Key agents; (5) Key hired Weidaman as a secretary at Nelken's suggestion and although she subsequently became an officer, director and shareholder of Key, she left Key to start working for Diversified; (6) Diversified's new agency in Aurora employed defendant Fabian and five other agents that previously worked for Key in addition to several telephone solicitors and writing agents.
 
 
 14
 The defendants respond that their actions are equally consistent with defendants' permissible independent interests, i.e., that termination occurred "because of a lack of production and violations of its [Key's] agency contract." Brief of ITT at 4-5. As noted in the factual summary, evidence in the record supports that position. Key generated only four applications for insurance during the two-month period from the commencement of sales activity to the date when termination was recommended, and one of the four involved contractual violations. Key was experiencing financial difficulties, and since Diversified, as the FMD, was liable for the advances paid to Key and its agents, it rightfully could be concerned with those difficulties. Furthermore, evidence revealed that Key's agreement with Global Marketing to conduct a door-to-door photograph sales program had been accompanied by Global's recruitment of Key insurance agents to participate in the Global program, thus diminishing Key's ability to perform as an insurance agency.
 
 
 15
 Finally, there is evidence from the defendants that Fabian and other agents did not approach Nelken to express an interest in continuing as ITT agents until after they learned of Key's termination. ITT and Diversified permitted the agents to sell ITT insurance under Diversified only after Key's president signed releases for each of them. Weidaman also left Key and began working for Diversified. Key has never described the role that Weidaman allegedly played in the conspiracy, and absent any evidence to the contrary, the mere fact that she decided to transfer with the agents does not necessarily imply participation in a conspiracy allegedly involving them. Under all these circumstances, it was at least as consistent with the permissible independent interests of the defendants for Diversified, through Nelken, to recommend to ITT that it terminate Key's contract as to have illegally conspired in that regard.
 
 
 16
 B. Is There Any Evidence Tending to Exclude the Possibility of Defendants' Permissible Independent Interests?
 
 
 17
 The second prong of the Matsushita test is easily satisfied in this case. No evidence was presented tending to exclude the possibility that the defendants were pursuing permissible independent interests. Certainly, the termination itself does not tend to exclude such a possibility. No conspiratorial conversations or premature agreements between Nelken and Key's agents were disclosed, and the only fact that provides any support to the theory of concerted activity is Diversified's opening of an office in Aurora after Key was terminated. This ambiguous evidence, however, also does not tend to exclude the possibility that each defendant was pursuing independent interests. We conclude, as we did in Gibson, that "the independent plausible explanations for the defendants' conduct bring this case within the Matsushita test for awarding summary judgment in a case alleging a conspiracy to violate the antitrust laws." Gibson, 818 F.2d at 725.
 
 II.
 
 18
 Even if Key could have provided sufficient factual evidence to support its theory of conspiracy in restraint of trade, independent legal grounds for granting defendant's motion for summary judgment under section one of the Sherman Act are available. "To prove that a conspiracy or other form of agreement violates section one of the Sherman Act, the plaintiff must show either that it falls in one of the categories of 'per se' illegality or that it has an actual or at least probable anticompetitive effect [known as the rule of reason]." Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos., 682 F.2d 660, 663 (7th Cir.1982). The conspiracy alleged by Key fails both of those tests as a matter of law.
 
 
 19
 A. Per Se Illegality.
 
 
 20
 "Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." Continental TV, Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49-50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The Supreme Court has applied the rule of per se illegality only to particular types of concerted behavior, including horizontal and vertical price-fixing agreements,[3] Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332, 343-48, 102 S.Ct. 2466, 2472-75, 73 L.Ed.2d 48 (1982), and group boycotts, Fashion Originators' Guild v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).
 
 
 21
 The alleged conspiracy involving ITT, Diversified, Nelken and the former agents and employees of Key is vertical in its arrangement. This circuit applies a per se rule to vertical restraints of trade only if they include price-fixing motives. Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1222-24 (10th Cir.1986). In Westman, we held that a vertical refusal to deal was not illegal per se:
 
 
 22
 "[I]n the absence of any evidence of intent to raise prices ... an agreement whereby a supplier of some good or service refuses, at the behest of one of his distributors, to deal with a competitor of that distributor is not illegal per se."
 
 
 23
 Id. at 1223 (ellipses original) (quoting Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos., 682 F.2d 660, 663 (7th Cir.1982)). Thus, since no price fixing allegation is contained in Key's complaint, under the holding in Westman, the alleged conspiracy in this case is not per se illegal.
 
 
 24
 The cases upon which Key relies do not dictate a contrary result. A common thread in most of them is that the alleged concerted activity among defendants included price-fixing motives. In Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), cited to us by Key, an appliance dealer attempted to prevent a discounter from selling at reduced prices by persuading several manufacturers to cease selling to the discounter or to sell to it only at artificially inflated prices. The court found that the agreement was per se illegal. Id. at 212-13, 79 S.Ct. at 709-10. Klor's involved several manufacturers at the same horizontal level with price-fixing as their apparent objective. Neither of those factors exist in this case.[4]
 
 
 25
 Key cites Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir.1979), for the proposition that a per se violation can be found from agreements between a single competitor and a manufacturer, but Cernuto also involved price-fixing. The Third Circuit acknowledged the "price orientation" of the alleged conspiracy, id. at 165, 168, 170, and distinguished Oreck Corp. v. Whirlpool Corp., 579 F.2d 126 (2d Cir.) (en banc), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), on the basis that the price-fixing motivations and the breach of contract which existed in Cernuto were absent in Oreck.
 
 
 26
 Key relies on our decision in Blankenship v. Herzfeld, 661 F.2d 840 (10th Cir.1981), to support its position that a vertical agreement can be per se illegal absent price-fixing motives. Key's argument, however, was made without the benefit of the Westman decision. As we stated in Westman, "Blankenship should not be read to imply that we would apply the Cernuto per-se-illegality standard absent allegations of price fixing or maintenance." Westman, 796 F.2d at 1224 n. 2.[5]
 
 
 27
 Relying principally upon the Third Circuit's decision in Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co., 734 F.2d 133 (3d Cir.), cert. denied, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984), Key argues that the alleged conspiracy in this case was a per se illegal group boycott. The court in Malley-Duff defined a group boycott to include a vertical agreement in which a customer pressures a manufacturer or supplier to terminate its relationship with another customer. Id. at 140-41. This definition of a group boycott is contrary to our holding in Westman. In Westman, we stated that in order for a group boycott to exist, "there must be an agreement among conspirators whose market positions are horizontal to each other." Westman, 796 F.2d at 1224 n. 1 (emphasis added). While the competitors need not be at the same market level as the plaintiff, there must be concerted activity between two or more competitors at same market level.[6]
 
 
 28
 ITT and Diversified are clearly at different market levels. Apparently in an attempt to classify Diversified and Key as competing general agents at the same market level, Key argues that Nelken was the FMD and that Diversified was a general agent under Nelken. But Key itself is not alleged to be a co-conspirator in this case, only some of its employees. And, however characterized, as FMD and/or general agent, Diversified operated at a different market level from those agents and employees of Key who allegedly participated in the conspiracy.[7] Since no two of the defendants in this case are competitors of each other on the same horizontal market level, the conspiracy cannot comprise a group boycott and is not per se illegal.
 
 
 29
 B. Rule of Reason.
 
 
 30
 Key asserts that even if the conspiracy is not illegal per se, the case should be allowed to proceed to trial under a rule of reason theory. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). In order to satisfy the rule of reason, the plaintiff must prove that the termination had an adverse effect on competition. Although Key is not required to satisfy its burden of proof prior to trial, it must at least present its legal theory and support it with more than conclusory allegations.
 
 
 31
 Key argues that the elimination of even a single competitor may reduce competition and that "the trier of fact should be allowed to make that determination." But Key has failed to make any showing that competition was threatened or injured. Merely pointing to Key's elimination from the ITT life insurance market is not enough to withstand summary judgment. The antitrust laws are designed to protect and promote consumer welfare. See, e.g., NCAA v. Board of Regents, 468 U.S. 85, 107, 104 S.Ct. 2948, 2963, 82 L.Ed.2d 70 (1984); Reiter v. Sonotone Corp., 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979). As the Seventh Circuit stated in Products Liability:
 
 
 32
 The consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him a competitive price and quality.
 
 
 33
 682 F.2d at 664. It is undisputed that there was no price or service competition among agents selling ITT life insurance. These factors were controlled by ITT itself. There is no evidence that ITT life insurance was less available as a result of Key's termination. Further, it would not be in ITT's interest to participate in a conspiracy with a seller to enable the seller to restrict the availability of ITT insurance or to monopolize the ITT market, giving the seller a greater degree of influence over ITT's pricing policies and commission rates. Even if ITT insurance ultimately became less available, there is no allegation or evidence that there was a lack of reasonable substitutes in the Colorado life insurance market. "The evil to be avoided [under section one] is the reduction of interbrand competition between the manufacturer's distributors, not the reduction of intrabrand competition." Westman, 796 F.2d at 1229 (emphasis original). Key has presented no theory or evidence to support the claim that competition was injured from a consumer perspective. The only fact pointed to is that Key itself was injured. That allegation alone is insufficient to withstand summary judgment on Key's rule of reason theory.
 
 III.
 
 34
 A separate inquiry is necessary with respect to Key's section two claim, since the Matsushita test, previously discussed, applies only to section one of the Sherman Act. Under section two Key alleges that the defendants attempted to monopolize ITT life insurance in Colorado. Four elements must be proved to establish a section two violation: (1) the relevant product and geographical market in which the attempt occurred; (2) a dangerous probability of success in monopolizing the relevant market; (3) the specific intent to monopolize; and (4) conduct in furtherance of the attempt. Shoppin' Bag of Pueblo, Inc. v. Dillon Cos., 783 F.2d 159, 161 (10th Cir.1986). See also Bright v. Moss Ambulance Serv., Inc., 824 F.2d 819, 823 (10th Cir.1987). To withstand a summary judgment motion the evidence must set forth some basis to support these elements of the claim.
 
 
 35
 Key apparently would define the geographical market as the state of Colorado and the relevant product market as "ITT life insurance." It concedes that a company cannot be liable for monopolizing its own product and argues, instead, that it was Diversified and Nelken that were attempting to monopolize the ITT life insurance market in Colorado. ITT life insurance is not an appropriately defined product market in this case. Evidence in the record suggests, without dispute, that as a consumer product there was little to differentiate ITT life insurance from other life insurance. Key argues that ITT's policy of advancing the entire premium on an insurance contract to agents was unique among insurance companies and served to enable Key to remain in business. As emphasized above, the purpose of antitrust laws is the promotion of consumer welfare. NCAA v. Board of Regents, 468 U.S. at 107, 104 S.Ct. at 2963. Even if we assume that ITT did pay a higher advance to its agents than other companies, there is no argument that this affected the desirability, availability, or price of the product at the consumer level.
 
 
 36
 Key's claim similarly cannot satisfy the second element of a section two claim: dangerous probability of success in monopolizing the relevant market. This court recently clarified the law under this element:
 
 
 37
 Traditionally, the "dangerous probability" element may be shown through the market power of the predator....
 
 
 38
 [M]onopoly power is correctly defined in this circuit as the ability to control prices and exclude competition.
 
 
 39
 Shoppin' Bag, 783 F.2d at 161, 164 (emphasis original). Key does not argue that any of the defendants other than ITT itself had any ability to control the price at which ITT life insurance was sold.[8] The undisputed facts in the record indicate that there was no price or service competition among agents selling ITT life insurance. Consequently, eliminating Key from the market could not give Diversified any greater control over prices.
 
 
 40
 Key argues at length that "the elements of a cause of action need not be specified in a complaint." Opening Brief of Key at 18. The elements, however, must be supported by at least some evidence to withstand summary judgment. Upon review of the legal theories and facts set forth in the complaint, briefs, and discovery record, we conclude that the facts of this case, liberally interpreted in favor of the plaintiffs, cannot support a claim under section two. This is exactly the type of situation summary judgment was designed to accommodate. See Bright, 824 F.2d at 825 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)) (summary judgment on a section two monopolization claim was mandated " 'against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case' "); Carey v. Continental Airlines, Inc., 823 F.2d 1402, 1404 (10th Cir.1987) (defendants entitled to summary judgment "because the plaintiff failed to allege, much less produce evidence of, an element essential to his Sec. 1983 claim"). Allowing the case to proceed to trial would be futile for the plaintiffs and an increased burden and expense for all involved.
 
 IV.
 PENDENT STATE CLAIMS
 
 41
 The district court dismissed the pendent state law claims in this case. That decision cannot be overturned absent an abuse of discretion. Curtis Ambulance of Florida, Inc. v. Board of County Comm'rs, 811 F.2d 1371, 1386 (10th Cir.1987). The plaintiffs appear to concede that the court properly exercised its discretion if the dismissal of the federal claims is affirmed by this court. Opening Brief of Key at 21; Reply Brief of Key at 9. The district court did not abuse its discretion in dismissing the claims here. Curtis Ambulance, 811 F.2d at 1386; see also Carey, 823 F.2d at 1404.[9]
 
 CONCLUSION
 
 42
 Our holding in this case makes it unnecessary to address the other arguments made by the parties. For the reasons we have set forth, the district court properly granted summary judgment for the defendants on the federal antitrust claims. It was within the district court's discretion to dismiss the pendent state claims. The decision of the district court dismissing the plaintiffs complaint is, therefore, AFFIRMED.
 
 
 
 [1]
 Reuben S. Sorensen and Anne-Marie Sorensen, both stockholder-directors of Key Financial Planning, are also plaintiffs/appellants. For ease of reference, we refer to the plaintiffs collectively as "Key."
 
 
 [2]
 Weidaman had been hired upon Nelken's recommendation and was made an officer and board member of Key. Sorensen admitted that he knew he was not entitled to advances on policies sold to employees. Deposition of Reuben S. Sorensen, R. Vol. IV at 163-65. He apparently instructed Weidaman to misrepresent her employment status. Deposition of Weidaman, R. Vol. IX at 164-65
 
 
 [3]
 A horizontal conspiracy occurs when competitors at the same market level agree to restrain trade, whether at their own or another market level. Vertical restraints result when persons or firms at different market levels in the chain of distribution of a specific product conspire to restrain trade
 
 
 [4]
 Other courts have refused to follow Klor's, absent price-fixing objectives or concerted activity among horizontal competitors. See, e.g., Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos., 682 F.2d 660, 663 (7th Cir.1982); A.H. Cox & Co. v. Star Mach. Co., 653 F.2d 1302, 1305 (9th Cir.1981); Oreck Corp. v. Whirlpool Corp., 579 F.2d 126, 131-32 (2d Cir.) (en banc), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978)
 
 
 [5]
 Key also argues that this case is similar to the conspiracy in Com-Tel, Inc. v. DuKane Corp., 669 F.2d 404 (6th Cir.1982). In Com-Tel, however, "the ultimate effect of the successful coercion was a horizontal combination of [three separate DuKane distributors], all refusing to sell to Com-Tel because of their concerted actions." Id. at 413. In contrast, the alleged conspiracy here does not include two or more competitors at any one horizontal market level
 
 
 [6]
 The district court held that "Key must demonstrate ... that its contract with ITT was terminated as a result of a conspiracy that includes at least two competitors on the plaintiffs' horizontal distributional level." R. Vol. I at 147. The conspiracy among horizontal competitors need not occur at the plaintiff's market level
 
 
 [7]
 Hiring of a rival's employees does not make an arrangement per se illegal under section one. See Mid-West Underground Storage, Inc. v. Porter, 717 F.2d 493, 496-97 (10th Cir.1983) (" 'The difficulty with [the per se] approach is that the alleged conspiracy tends to be a spurious one, often between the defendant and parts of his own enterprise. Given, moreover, that the hiring of a rival's employees is not ordinarily exclusionary, even when done by a monopolist, characterizing the employment as a conspiracy seems little more than a semantic trick that is inconsistent with employee mobility.' " Id. at 496 (quoting 3 P. Areeda & D. Turner, Antitrust Law Sec. 828b, at 323 (1978))
 
 
 [8]
 Key argues that Diversified was paid a higher commission than Key and that each general agent was free to determine what portion of its total commission would be shared with its agents. Regardless of differences in the amount of the commissions received from ITT by Diversified and Key and the proportions in which they were distributed to agents, the price charged to ultimate consumers was the same
 
 
 [9]
 Dismissal of all the federal claims prior to trial, as here, may not always require the dismissal of the pendent state claims in all cases. See, e.g., Rosado v. Wyman, 397 U.S. 397, 404-05, 90 S.Ct. 1207, 1213-14, 25 L.Ed.2d 442 (1970); Graf v. Elgin, Joliet & E. Ry., 790 F.2d 1341, 1347-48 (7th Cir.1986); Province v. Cleveland Press Pub. Co., 787 F.2d 1047, 1054-55 (6th Cir.1986)