**Ray L. INGRAM, Plaintiff,**

v.

**PRE–PAID LEGAL SERVICES, INC., an Oklahoma corporation, Defendant.**

No. 97–572–S.

United States District Court, E.D. Oklahoma.

May 15, 1998.

Marilyn Dyda Barringer, Oklahoma City, OK, for Plaintiff.

Gayle L. Barrett, Oklahoma City, OK, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SEAY, District Judge.

Plaintiff Ray L. Ingram was employed by Defendant Pre–Paid Legal Services, Inc. (Pre–Paid) from September 1989 until his discharge from employment on October 20, 1995. Ingram brings this action pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, alleging he was discriminated against on account of his

sex and age with respect to promotions and his eventual termination. Additionally, Ingram contends Pre–Paid retaliated against him in violation of Title VII because he opposed Pre–Paid's allegedly discriminatory employment practices. Finally, Ingram asserts state law claims for invasion of privacy and for violation of the public policy of the State of Oklahoma. Pre–Paid has filed a motion seeking the entry of summary judgment in its favor on all claims asserted by Ingram.[1] For the reasons stated below, the court finds Pre–Paid is entitled to summary judgment on Ingram's federal claims brought under Title VII and the ADEA. The court also finds it appropriate to dismiss without prejudice Ingram's state law claims.

## I. FACTUAL BACKGROUND

Ingram began working for Pre–Paid in September 1989 as a customer service representative at an hourly rate of $6.00. In June 1992, Ingram was transferred to the benefits administration department, where he remained until his termination on October 20, 1995. At the time of his discharge, Ingram was being paid $8.00 per hour and he was fifty-five years old. In addition to various managerial experiences throughout his work history, Ingram has a Bachelor of Arts degree with a double major in political science and history and a minor in English. Ingram also has a Master of Business Administration degree with emphasis in personnel management and labor relations.

During the early part of Ingram's tenure in the customer service department, Ms. Marilyn Douglas was his supervisor. In October 1990, Douglas left the customer service department and transferred to the member benefits department to become its manager. Ms. Leslie Fisher succeeded Douglas as manager of the customer service department and Fisher became Ingram's supervisor. Fisher remained Ingram's supervisor until July 1992, when Ingram transferred to the benefits administration department and was once again under the supervision of Douglas. Sometime in 1994, Fisher left the customer service department and transferred to the position of manger of attorney resources. Ms. Trish Weaver, who became manager of marketing services in June 1990, took over Fisher's position and became the manager of the combined department of marketing and membership services.

In September 1995, three supervisory positions were created in the customer service department under the supervision of Weaver. Ingram had never worked under Weaver's supervision. The new positions were announced by Douglas to Ingram and others in the benefits administration department at a staff meeting. Weaver eventually selected three women to fill the newly created supervisory positions—Rita Harris, supervisor of membership administration; Sheila Burris, supervisor of marketing services; and Angie Colbert (Angie Wilkerson at the time of the promotion), supervisor of customer service.

Following the selection of these three women, Ingram went to the office of the director of human resources, Ms. Charlene Sanders, on September 25, 1995, to inquire about why he was not chosen for one of the supervisory positions. Ingram believed he should have been chosen for the position in the customer service department—the position filled by Colbert, a twenty-nine year old female with just under two years experience with Pre–Paid. On that same day, Ingram had a separate conversation with Douglas about the same subject matter. Ingram tape recorded both conversations by concealing a tape recorder under his shirt. Neither Sanders nor Douglas were aware that they were being recorded and neither were advised by Ingram that he was tape recording the conversations. A review of the transcripts of both conversations reveals Ingram dissatisfaction with the choice of Colbert and his belief that he was not chosen because he was on some company "blacklist." The conversations were essentially one-sided with Ingram

---

1. Pre–Paid also seeks summary judgment on a hostile work environment sexual harassment claim. Although paragraph eleven of the amended complaint contains language consistent with such a claim, Ingram has apparently abandoned any such claim by failing to respond to Pre–Paid's summary judgment argument on this issue. Ingram has failed to provide the court with any facts or legal argument to support a sexual harassment claim in this action. Consequently, the court considers such sexual harassment claim abandoned by Ingram.

detailing his qualifications and the fact that he had been humiliated and embarrassed by the choice of Colbert for the supervisory position in the customer service department. At no time during these conversations did Ingram express any belief on his part that Pre–Paid's failure to promote him was based on either his sex or age. Likewise, no statements were made by either Sanders or Douglas which would suggest the failure to promote Ingram was in any way motivated by his sex or age.

Ingram kept the tape and the tape recorder in his personal medicine bag he brought to and from work each day. Ingram also kept in that bag a note from Sanders, some medicine, and travelers checks. The note from Sanders referenced her conversation with Randy Harp, Chief Financial Officer for Pre–Paid, regarding the promotion of Colbert. In the note, Sanders informed Ingram that Harp told her that Weaver "was more comfortable with Colbert" for the supervisory position in the customer service department. On or about October 20, 1995, Douglas opened Ingram's bag while on the premises of Pre–Paid and removed Sanders' note, the tape, and the tape recorder. After Douglas and Sanders listened to the tape, they informed Ingram he was being terminated for surreptitiously tape recording conversations. Ingram's tape recorder was immediately returned to Ingram and the tape was later returned on November 8, 1995, after Pre–Paid made a copy of it for its records.

On June 27, 1996, Ingram completed a "Mail In Information Sheet" form provided by the Equal Employment Opportunity Commission (EEOC). Ingram mailed this form to the EEOC's Oklahoma City office. This form, otherwise known as an "Intake Questionnaire", states at the top that "THIS IS NOT A CHARGE OF DISCRIMINATION." The form contains information about Ingram's name, address, social security number, telephone number, birth date, and basic information concerning his employment with Pre–Paid, including Pre–Paid's address, number of employees, and contact person. Also included on this form is a section allowing Ingram to identify the alleged type of discrimination (sex and age) and the unlawful employment practices (discharge and denial of promotion). Another section allowed Ingram to provide a narrative detailing the alleged discriminatory acts. Ingram completed five pages wherein he detailed the Colbert promotion and his termination following discovery of his tape recordings. Ingram also provided general observations regarding the gender composition of Pre–Paid's workforce as well as a 1994 conversation he had with Sanders concerning his interest in a supervisory position created by Douglas' resignation.

Along with the Intake Questionnaire submitted on June 27, 1996, Ingram submitted an affidavit which attests to the truth of matters contained therein regarding background information on himself and Pre–Paid. On September 16, 1996, Ingram received a letter from the EEOC's Oklahoma City office notifying him that the Oklahoma Human Rights Commission had waived its right to initial action on his charge and that the EEOC would be investigating his charge. Subsequently, on September 30, 1996, a formal charge of discrimination was filed by Ingram with the EEOC claiming sex and age discrimination against Pre–Paid with respect to a denial of promotion and discharge. On July 11, 1997, the EEOC issued a dismissal and notice of right to sue with regard to Ingram's charge. On October 9, 1997, Ingram filed his complaint in this court.

## II. STANDARD

Having moved for summary judgment in its favor under Rule 56 of the Federal Rules of Civil Procedure, Pre–Paid's initial burden is to show the absence of evidence to support Ingram's case. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Pre–Paid must identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish the absence of any genuine issue of material fact. *Universal Money Centers v. AT & T*, 22 F.3d 1527, 1529 (10th Cir.), *cert. denied*, 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994) (quoting Fed.R.Civ.P. 56(c)). Pre–Paid need not negate Ingram's claims or disprove his evidence, but rather,

its burden is to show that there is no evidence in the record to support Ingram's claims. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Ingram, as the nonmoving party, must go beyond the pleadings and "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [he] carries the burden of proof." *Applied Genetics v. First Affiliated Securities,* 912 F.2d 1238, 1241 (10th Cir.1990).

Summary judgment is not appropriate if there exists a genuine material factual issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Thomas v. IBM,* 48 F.3d 478, 486 (10th Cir.1995) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). In this regard, the court examines the factual record and reasonable inferences therefrom in the light most favorable to Ingram. *Deepwater Invs. Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir. 1991). This court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. With these standards in mind, the court turns to the merits of Pre–Paid's motion.

## III. ADMINISTRATIVE PREREQUISITES

■ As an initial point, Pre–Paid argues summary judgment is appropriate on Ingram's sex and age discrimination claims because Ingram did not timely file his charge of discrimination with the EEOC. Under both Title VII and the ADEA, a complainant is required to file a charge of discrimination within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e); 29 U.S.C. § 626(d); *Martin v. Nannie & Newborns,* 3 F.3d 1410, 1414 n. 4 (10th Cir.1993)(under 42 U.S.C. § 2000e–5(e)(1), a 300–day period, as opposed to a 180–day period, applies in states such as Oklahoma

that have statutorily prohibited sexual discrimination).

Pre–Paid contends Ingram's formal charge was not filed until September 30, 1996, which is more than 300 days from the last act of discrimination alleged—Ingram's October 20, 1995, discharge. Ingram counters by relying on his June 27, 1996, submission of the Intake Questionnaire and affidavit to the EEOC. It is Pre–Paid's position, however, that the only relevant document is the September 30, 1996, formal charge and that the Intake Questionnaire and affidavit filed on June 27, 1996, do not constitute a charge and are therefore of no consequence to the timeliness issue. As a result, Pre–Paid argues Ingram's claims are time barred. The court disagrees with Pre–Paid.

The principle argument presented by Pre–Paid in support of its position is the fact that the EEOC Intake Questionnaire states at the top of the document that "THIS IS NOT A CHARGE OF DISCRIMINATION." Thus, since the EEOC does not regard the Intake Questionnaire as a formal charge, Pre–Paid contends such form is not a formal charge as a matter of law. Pre–Paid relies on *Diez v. Minnesota Mining and Manu. Co.,* 88 F.3d 672 (8th Cir.1996) for the proposition that an Intake Questionnaire is not regarded as a charge by the EEOC. *Diez,* however, is distinguishable from the facts herein.

In *Diez,* the court determined Diez had not presented any evidence "to prove the questionnaire was intended to function as a charge in his case." *Id.* at 677. The court recognized the possibility that Intake Questionnaires could function as formal charges, but declined to make such a finding as to Diez because he merely submitted an affidavit stating he contacted state human rights officials and completed and filed an Intake Questionnaire. *Id.* The court cited various relevant factors to consider in making the determination about an individual's intent with respect to the filing of an Intake Questionnaire: (1) what the claimant and the EEOC personnel said to each other; (2) what the questionnaire form said; (3) and what the EEOC actually did in response to receipt of the Intake Questionnaire. *Id.* at 676. Diez failed to provide any evidence in sup-

port of these factors and the record otherwise indicated Diez understood the questionnaire to be preliminary and not a formal charge.

Although Ingram's situation has a some factual similarities to Diez's—a subsequently filed formal EEOC charge and wording on the Intake Questionnaire informing of the preliminary nature of the form—one critical factor is present in this case which requires a finding that the Intake Questionnaire completed by Ingram, along with his affidavit, constitute a formal charge. Here, the EEOC *treated* Ingram's Intake Questionnaire and affidavit as a charge. In a September 16, 1996, letter, Alma Anderson, EEOC Area Director, informed Ingram of the following:

> This letter is to notify you that the Oklahoma Human Rights Commission has waived its right to initial action on your *charge*. Your *charge* will be investigated by the U.S. Equal Opportunity Commission.
>
> *You need take no action at this time.* When your *charge* is assigned to investigation, you will be contacted by this office. (Emphasis added).

This letter was sent to Ingram prior to his filing of a formal charge on September 30, 1996. It is readily apparent from the communication sent by Anderson that the EEOC itself considered Ingram's Intake Questionnaire and affidavit as a charge. Thus, given the EEOC's treatment of Ingram's Intake Questionnaire and affidavit as a charge, the court concludes Ingram timely filed his administrative charge on June 27, 1996, within the applicable 300–day limitation period. *See Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1138 (7th Cir.1994) (in determining whether a plaintiff has manifested an intent to activate the ADEA's machinery by filing an Intake Questionnaire, a relevant consideration is whether the EEOC *treated* the questionnaire as a charge.)

■ A related issue exists with respect to the scope of the unlawful employment practices contained within Ingram's charge. Pre–Paid contends Ingram is limited to the 1995 failure to promote and discharge claims specifically set forth in both the Intake Questionnaire and the formal charge. It is Pre-

Paid position that Ingram should not be allowed to assert claims for alleged discriminatory acts predating 1995. Specifically, Pre-Paid seeks to preclude Ingram from presenting claims related to his contention that he should have been promoted to certain manager positions in 1990 and 1994:(1) the human resources manager job in July 1990, instead of Sanders; (2) the benefits administration manager job in October 1990, instead of Douglas; (3) the marketing service manager job in June 1990, instead of Weaver; (4) the customer service manager job in October 1990, instead of Fisher; (5) the attorney resources manager job in 1994, instead of Fisher; and (6) the customer services manager job in 1994, instead of Weaver.

The first inquiry the court must make is whether these other acts of alleged unlawful employment practices have been preserved by Ingram's EEOC charge. If the charges were not properly brought by Ingram in his EEOC charge, this court would be without jurisdiction to hear them. *Martin*, 3 F.3d at 1416 n. 7. The Tenth Circuit has adopted a test from other circuits to determine whether or not particular complaints have been preserved in an EEOC charge:

> consideration of complaints not expressly included in the EEOC charge is appropriate where the conduct alleged would fall within the scope of an EEOC investigation which could reasonably grow out of the charges actually made. *Powers v. Grinnell Corp.*, 915 F.2d 34, 38–9 (1st Cir.1990); *Butts v. City of New York Dep't of Hous.*, 990 F.2d 1397, 1402 (2d Cir.1993); *King v. Seaboard Coast Line Railroad Co.*, 538 .F.2d 581, 583 (4th Cir.1976)

*Martin*, 3 F.3d at 1416 n. 7. Here, Ingram generally referred to Pre–Paid's discriminatory employment practices by referencing "observations" and "patterns" within Pre–Paid with respect to sex and age. Ingram also specifically identified the 1994 managerial opening involving Douglas. Given the general tenor of Ingram's "observations" and "patterns", as well as the inclusion of the specific incident involving Douglas, the court concludes that the allegations of discrimination based on sex and age in connection with the managerial openings in 1990 and 1994

could reasonably have been expected to come to light from an investigation of the acts of discrimination related to the 1995 failure to promote and discharge allegations. Thus, Ingram's charge is sufficient to preserve the pre–1995 allegations of discrimination for consideration by the court in this lawsuit.

## IV. CONTINUING VIOLATION THEORY

■ Even though the court has determined that Ingram's EEOC charge has preserved these pre–1995 claims for consideration, the fact that they all occurred outside the 300–day time limit imposed under Title VII and the ADEA would typically prohibit this court from considering them as discriminatory acts in conjunction with the claims set forth in this lawsuit. Ingram, however, attempts to seek recovery for these alleged discriminatory acts by invoking the "continuing violation doctrine." Under this doctrine, applicable to both Title VII and ADEA cases, a plaintiff is permitted to challenge discriminatory incidents that occurred outside the 300–day limitation period "if such incidents are sufficiently related [to events occurring within the time limitations period] and thereby constitute a continuing pattern of discrimination." *Hunt v. Bennett,* 17 F.3d 1263, 1266 (10th Cir.), *cert. denied,* 513 U.S. 832, 115 S.Ct. 107, 130 L.Ed.2d 55 (1994); *see Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1543 (10th Cir.1987)(ADEA claim application); *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 984 (10th Cir.1991) (Title VII application). In order to invoke this doctrine, Ingram must establish that Pre–Paid "engaged in a series of related discriminatory acts, at least one of which falls within the limitations period." *Mascheroni v. Board of Regents of Univ. of Cal.,* 28 F.3d 1554, 1561 (10th Cir.1994). The Tenth Circuit employs a three-part inquiry to determine whether such acts are part of a continuing course of conduct or are discreet unrelated acts: "(i) subject matter—whether the violations constitute the same type of discrimination; (ii) frequency, (iii) permanence—whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a

continuing threat to discriminate." *Martin,* 3 F.3d at 1415 (citing *Berry v. Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971, 981 (5th Cir.1983), *cert. denied,* 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986)).

■■ After analyzing these factors, the court concludes Ingram cannot avail himself of the continuing violation doctrine. Admittedly, the first two factors weigh in favor of Ingram. First, it is Ingram's contention that all of the incidents involving Pre–Paid's failure to promote him involved either sex or age discrimination. Second, Ingram contends Pre–Paid continually failed to consider him for promotions and career advancements throughout his tenure with the company. The third factor of permanence, however, strongly weighs against Ingram. As noted by the court in *Martin:*

> "[t]he continuing violation doctrine is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated. The permanence prong of the *Berry* test limits the reach of the continuing violation theory by restricting its operation to those situations underscored by its equitable foundation. That is, if an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge with the EEOC with respect to that event or series of events."

*Martin,* 3 F.3d at 1415 n. 6. (Citations omitted). Here, Ingram has failed to show that the nature of the violations are such that he would not have been aware of the need to assert his rights against Pre–Paid. If Ingram's current assessment of such events is to be believed, Pre–Paid acted in a discriminatory fashion in connection with these multiple pre–1995 incidents. Ingram, however, offers no explanation as to why he failed to timely initiate procedures to rectify what he believed, at the time, was characteristic of discriminatory conduct. Ingram was obligated to promptly assert his rights if he truly believed that Pre–Paid was discriminating against him with regard to these pre–1995

promotions.[2] In other words, Ingram cannot avail himself of the equitable continuing violation doctrine under circumstances where it is patently clear that a person in his position should have been, and indeed appears to have been, alerted to the need to act to assert his rights. Ingram cannot sit on his rights and then, at a later date, attempt to tag-along with other timely complaints of discriminatory conduct. Consequently, the court finds the only incidents of discriminatory conduct properly before it are the 1995 failure to promote and discharge incidents.

## V. RETALIATION

■ Pre–Paid raises a subject matter jurisdiction argument with respect to Ingram's retaliation claim. Pre–Paid contends the court is without jurisdiction to consider a retaliation claim since Ingram did not allege retaliation in connection with either the 1995 failure to promote or discharge claims. It is undisputed that Ingram failed to raise a retaliation claim in either the Intake Questionnaire filed on June 27, 1996, or the EEOC charge filed on September 30, 1996. Ingram did, however, send a letter to the EEOC on June 27, 1997, in an attempt to amend his charge to include a claim for retaliation.

There is no question but that the alleged discriminatory conduct—the 1995 denial of a promotion and discharge—occurred prior to the filing of Ingram's EEOC charge. Ingram was therefore aware of the alleged discriminatory acts at the time of his EEOC filings. Even though he was armed with such knowledge, he failed to assert a retaliation claim.

In *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th Cir.), *cert. denied,* ——

U.S. ——, 118 S.Ct. 342, 139 L.Ed.2d 266 (1997), the Tenth Circuit addressed the issue of whether a retaliation claim is reasonably related to claims originally brought in an EEOC charge. In *Seymore*, the court distinguished between retaliatory acts occurring prior to the filing of an EEOC charge and those occurring after such charge. The court held that retaliatory acts occurring after the filing of an EEOC charge are reasonably related to the original charge; therefore, no second EEOC complaint need be filed. *Id.* at 799. Prior acts of retaliatory conduct, however, are treated differently. In this regard, the court held "where a retaliatory act occurs prior to the filing of a charge and the employee fails to allege the retaliatory act or a retaliation claim in the subsequent charge, the retaliatory act ordinarily will not reasonably relate to the charge." *Id.* The court applied this principle in *Seymore* and determined that a retaliatory discharge claim did not relate to the original EEOC charge alleging racial and sexual discrimination where such charge was filed nine days after Seymore's discharge. Likewise, in this case, Ingram's claim of retaliation does not relate to his original EEOC charge in that the alleged discriminatory acts occurred in 1995—prior to the filing of the charge in 1996. Thus, Ingram's failure to include a retaliation claim in his original charge is fatal to the presentment of such claim in this action.[3]

## VI. REVERSE GENDER DISCRIMINATION

■ Ingram asserts a disparate treatment claim for reverse gender discrimination alleg-

---

**2.** Ingram's credibility concerning his assessment of Pre–Paid's pre–1995 conduct is substantially weakened by his failure to specifically raise such incidents in either the Intake Questionnaire or the formal EEOC charge. In fact, in the formal EEOC charge, Ingram failed to check the box for a "continuing violation" and he identified the earliest discrimination date as September 1, 1995. These omissions are indicative of a last-minute fabrication of discriminatory intent assignable to Pre–Paid with regard to the pre–1995 events solely for the purpose of bootstrapping Ingram's timely filed claims of discrimination.

**3.** Ingram's June 30, 1997, letter attempting to amend his charge to include a retaliation claim

does not alter this finding. Ingram's letter provides no details regarding the facts or circumstances surrounding any retaliation claim. Consequently, it does not operate as an effective amendment of the original charge. *See* 29 C.F.R. § 1601.12(a)(3) and (b) 1626.8(a)(3) and (c)(an effective EEOC charge includes "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices" and an amended EEOC charge requires the recitation of "additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge."

ing Pre–Paid denied him the 1995 promotion and discharged him because he was a male.[4] In order to establish a reverse discrimination claim, the typical requirements for a prima facie case of sex discrimination are modified. As a white male, Ingram is a member of an historically favored group. While Ingram need not show he is a member of a protected group, he must "establish background circumstances that support an inference that [Pre–Paid] is one of those unusual employers who discriminates against the majority." *Notari v. Denver Water Dep't,* 971 F.2d 585, 588–89 (10th Cir.1992). Ingram has failed to do so in this case.

■ Ingram relies on the deposition testimony of Glen Hyden, former chief operating officer for Pre–Paid, and a 1989 statement by Harold Stonecipher, CEO of Pre–Paid, in support of the background circumstances allegedly showing that Pre–Paid is one of those rare employees that discriminate against men. Hyden's testimony merely establishes his concern during his employment with Pre–Paid that there were no males in the mid-management level of Pre–Paid. Hyden also testifies about his recommendation of Ingram for employment with Pre–Paid and Hyden's belief that Ingram was qualified for advancement into managerial positions. Nothing in Hyden's testimony, however, establishes Pre–Paid as that rare employer necessary to establish a reverse sex discrimination case. In fact, Hyden's testimony establishes just the opposite. Hyden himself is an example of a male who advanced through the ranks of Pre–Paid. Hyden began his career at Pre–Paid as a customer service representative. He worked his way up through mid-managerial positions until he was ultimately promoted to chief operating officer prior to his

resignation in July 1991. Hyden's testimony, and the undisputed record, also establishes that all upper-level management at Pre–Paid are men. Hyden's career path along with the management structure of Pre–Paid are simply not indicative of an employer that discriminates against the majority. Moreover, Hyden's "concerns" about Pre–Paid's managerial makeup and his disagreement with corporate operating philosophies are not evidence of an intent on the part of Pre–Paid to discriminate against men.

■ Ingram's reliance on Stonecipher's statement is similarly misplaced. Ingram references Hyden's deposition testimony wherein Hyden recounts Stonecipher stating in 1989 that "it appeared to him that if you were not young and female, you didn't have opportunities for management in the company, if you were to walk down the halls of the company." This comment, by itself, is merely Stonecipher's observation of the composition of the Pre–Paid workforce. Unlike Ingram, the court fails to perceive any discriminatory animus flowing from such a statement. To the extent the court must, on summary judgment, interpret the statement as evidence of discriminatory intent and not as a mere observation of the composition the workforce, the court nonetheless concludes it is an isolated, stray comment which is unrelated to any claim of sex discrimination by Ingram in connection with the 1995 failure to promote or discharge claims. The Tenth Circuit has held that "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions." *Cone v. Longmont United Hospital Association,* 14 F.3d 526, 531 (10th Cir.

---

4. In his brief, Ingram argues for the first time a disparate impact claim against Pre–Paid. This claim fails for two reasons. First, Ingram failed to plead such claim in his amended complaint. Nothing in Ingram's amended complaint fairly notified Pre–Paid of the existence of a disparate impact claim. Second, even assuming such a claim had been plead, Ingram has wholly failed to identify an employment practice by Pre–Paid which has a substantial adverse impact on his claimed protected group. *Drake v. City of Fort Collins,* 927 F.2d 1156, 1161 (10th Cir.1991). Ingram alludes to Pre–Paid's practice of not noticing managerial openings as evidence of discriminatory intent. As noted by Pre–Paid, however, there is no evidence in the record suggesting that younger female employees at Pre–Paid were informed of such openings, while older male employees such as Ingram were not informed. Pre–Paid's practice of not posting job openings apparently applied across the board—to male and female, young and old employees alike. Finally, Ingram's attempted use of statistical evidence is insufficient as he offers no meaningful statistical comparisons. *See id.* (sample of one insufficient to demonstrate a substantial impact).

1994). In order to utilize Stonecipher's comment as evidence of discriminatory intent in this case, Ingram must demonstrate a nexus between the statement and Pre–Paid's 1995 decisions regarding promotion and discharge. Ingram has not demonstrated this nexus. Absolutely no connection has been shown between Stonecipher's comment and any decision related to Ingram's employment. Simply stated, Stonecipher's comment made more than six years from the alleged discriminatory conduct—the 1995 failure to promote and discharge—is not sufficiently linked to the underlying allegations so as to raise an inference of discriminatory intent on the part of Pre–Paid.

█ Ingram has likewise failed to establish a prima facie case of sex discrimination by presenting "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the [his] status the challenged employment decision would have favored [him]." *Notari*, 971 F.2d at 589–90. Ingram challenges the 1995 promotion of Colbert to the position of supervisor of the customer service department. The undisputed evidence with respect to this position, however, is that Weaver, the customer service manager, selected Colbert because Colbert had worked with Weaver in the customer service department for the preceding nineteen months and Weaver necessarily had the opportunity to observe Colbert's work habits and relations with co-workers. Ingram, on the other hand, had never worked for Weaver. Ingram offers nothing to contradict or call into question Weaver's assessment of Colbert. Rather, Ingram relies on Pre–Paid's failure to post an announcement and his own subjective assessment of his qualifications as compared to Colbert's. Neither of these factors supports a finding that but for his sex, Ingram would have been promoted. *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir.), *cert. denied*, 513 U.S. 819, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994) (failure to post job vacancies does not, standing alone, amount to evidence of intentional discrimination); *Shapolia v. Los Alamos National Laboratory*, 992

F.2d 1033, 1039 (10th Cir.1993) (plaintiff's own assessment of job performance not sufficient to raise issue of fact regarding pretext).

Ingram also appears to be challenging the 1995 promotions of Burris and Harris. Ingram's own statements, however, are inconsistent with a claim of discrimination in connection with these two positions. In the tape recorded conversations with Sanders and Douglas, it is readily apparent that Ingram is protesting only the promotion of Colbert.[5] Ingram essentially agrees with the promotions of Burris and Harris when he states "I'll be quite honest with you, two of them I thought were excellent, fine choices" and "I think two of them I have no qualms about . . . . I was thrilled with the other two." These statements are inconsistent with a claim of discrimination in connection with the promotions involving Burris and Douglas.

█ Ingram's sex discrimination claim with regard to his discharge must also fail for the reason that Ingram has not established Pre–Paid's proffered reason for his discharge as pretextual. Pre–Paid has consistently maintained that Ingram was terminated from his employment because he surreptitiously tape recorded conversations with Sanders and Douglas. In response, Ingram can only muster a contention that voices opposition or disagreement with Pre–Paid's decision. This is insufficient to establish pretext. No evidence has been presented showing a policy on the part of Pre–Paid to allow employees to surreptitiously tape record conversations with other employees, much less supervisory personnel. While Ingram may disagree with Pre–Paid's policy against such tape recordings, Pre–Paid is free to implement and enforce reasonable business regulations governing its internal operations. Moreover, no evidence has been presented by Ingram to establish different treatment of other employees who surreptitiously tape recorded conversations.

The court also rejects Ingram's claim that pretext is established because the discipline imposed—discharge—is contrary to the pro-

---

5. Ingram's failure to specifically reference the promotions of Burris or Harris in either the Intake Questionnaire or the formal EEOC charge provides additional support for the proposition that Ingram's failure to promote allegation was limited to Colbert's promotion.

visions contained in Pre–Paid's employee handbook. The handbook clearly classifies Ingram as an at-will employee. It further provides with respect to disciplinary action:

> The Company wholeheartedly subscribes to the philosophy that discipline must, wherever possible, be corrective rather than punitive. *However, there are rule infractions that are by their very nature serious enough to warrant termination without any previous warning* (e.g., proven theft, a serious breach of confidentiality, or lying on an employment application).

Plaintiff's Exhibit No. 18, Employee Handbook at p. 532. Certainly, the surreptitious tape recording of one's supervisors may implicate confidentiality and employee trustworthiness concerns to such an extent that immediate disciplinary would be justified. Pre–Paid's decision to discharge Ingram based on what it believed was a serious infraction warranting termination without warning is not subject to being second guessed by this court.

Finally, Ingram attempts to show pretext by pointing to the fact that Douglas was not disciplined for removing the items from his personal bag. This is not evidence of pretext for the simple reason that Ingram and Douglas are not similarly situated employees. *See Rea v. Martin Marietta Corp.,* 29 F.3d 1450 (10th Cir.1994). Douglas' act of removing items from Ingram's bag after becoming aware of the surreptitious tape recordings is entirely different in character from Ingram's conduct which resulted in his termination. Ingram was acting to protect his own interests when he tape recorded the conversations; he did not have Pre–Paid's interests in mind. To the contrary, it would be reasonable for Pre–Paid to conclude that Douglas' actions in removing the items and making a copy of the tape were taken in her supervisory role on behalf of Pre–Paid and not for some independent self-serving reasons.

## VII. AGE DISCRIMINATION

Ingram's age discrimination claim suffers from the same infirmity as his sex discrimination claim—Ingram has failed to establish pretext with respect to Pre–Paid's legitimate nondiscriminatory reasons related to the 1995 promotion of Colbert and his discharge. Consequently, Ingram has not shown that age was a factor in Pre–Paid's decisions regarding his employment.

## VIII. PENDENT STATE CLAIMS

 Ingram asserts pendent state claims for invasion of privacy and a violation of Oklahoma public policy. The court's decision to retain jurisdiction over a state law claim is discretionary where all federal claims have been dismissed and where an independent basis for jurisdiction, such as diversity of citizenship, does not exist. *Curtis Ambulance v. Shawnee City Board of County Commissioners,* 811 F.2d 1371, 1386 (10th Cir.1987); *Key Financial Planning Corp. v. ITT Life Insurance Corp.,* 828 F.2d 635, 643–44 (10th Cir.1987); *Pitts v. Turner and Boisseau Chartered,* 850 F.2d 650, 653 (10th Cir.), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989). While dismissal of state law claims is not automatic where all federal claims have been dismissed before trial, *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the court finds dismissal appropriate in this instance. Accordingly, Ingram's pendent state law claims are dismissed without prejudice.

## IX. CONCLUSION

Based on the foregoing reasons, Pre–Paid's motion for summary judgment is granted as to all federal claims asserted by Ingram under Title VII and the ADEA. Moreover, Ingram's pendent state claims for invasion of privacy and violation of Oklahoma public policy are dismissed without prejudice.